United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.  14-cr-00580-PJH |
| Plaintiff, | |
| v. | **PRETRIAL ORDER NO. 3** |
| MICHAEL MARR, JAVIER SANCHEZ, GREGORY CASORSO, and VICTOR MARR, | |
| Defendants. | |

Before the court is defendants' motion to suppress warrantless audio recordings (doc. no. 68).  The parties have filed supplemental post-hearing briefs, declarations and exhibits, and the matter is submitted.  Having reviewed the relevant legal authority, the parties' papers, argument of counsel, and evidence in the record, the court DENIES the motion to suppress for the reasons set forth below.

I.      BACKGROUND

Defendants challenge the warrantless use of audio recording devices to capture private conversations at the public entrance to the Alameda and Contra Costa County courthouses, on the ground that they had a reasonable expectation of privacy in their communications.  Doc. no. 68.  As conceded by defense counsel, defendants do not assert a reasonable expectation of privacy as to the video recordings.  Defendants also seek suppression of evidence tainted by the unlawful recordings.  Accordingly, the government's concession that it will not use the courthouse recordings in its case-in-chief does not moot the motion to suppress the recordings.

United States District Court
Northern District of California

## II.    LEGAL STANDARD

The United States Constitution protects "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "The Fourth Amendment protects people rather than places, but 'the extent to which the Fourth Amendment protects people may depend upon where those people are.'" *United States v. Nerber*, 222 F.3d 597, 599 (9th Cir. 2000) (quoting *Minnesota v. Carter*, 525 U.S. 83, 88 (1998)). To invoke the protections of the Fourth Amendment, a person must show he had a "legitimate expectation of privacy." *Katz v. United States*, 389 U.S. 347 (1967). In *Katz*, the Supreme Court held that as long as the target has a legitimate expectation of privacy, a warrant is required for the government to conduct electronic surveillance. To establish a "legitimate" expectation of privacy, he must demonstrate a subjective expectation that his activities would be private, and he must show that his expectation was "'one that society is prepared to recognize as reasonable.'" *Nerber*, 222 F.3d 597, 599 (quoting *Bond v. United States*, 529 U.S. 334, 338 (2000)).

Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-2522, prescribes the procedure for securing judicial authority to intercept wire communications in the investigation of specified serious offenses, and provides for suppression of unlawfully intercepted communications.

> Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court . . . if the disclosure of that information would be in violation of this chapter.

18 U.S.C. § 2515. Section 2510(2) defines "oral communication" as "any oral communication uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation." The Ninth Circuit has recognized that "the legislative history behind § 2510(2) reflects Congress's intent that [the Katz inquiry] serve as a guide to define communications that are uttered

2

under circumstances justifying an expectation of privacy," that is, whether the

communications were made by a person (1) who has a subjective expectation of privacy,

and (2) whose expectation was objectively reasonable.  *United States v. McIntyre*, 582

F.2d 1221, 1223 (9th Cir. 1978) (citations omitted).  *See United States v. Cha*vez, 416

U.S. 562, 575 (1974) ("suppression is not mandated for every violation of Title III, but only

if 'disclosure' of the contents of intercepted communications, or derivative evidence,

would be in violation of Title III"); *United States v. Duran*, 189 F.3d 1071, 1084 (9th Cir.

1999) ("Suppression is required: (i) if the communication was unlawfully intercepted;

(ii) the order of authorization or approval under which it was intercepted is insufficient on

its face; or (iii) the interception was not made in conformity with the order of authorization

or approval.") (citing 18 U.S.C. § 2518(10)(a)).

The district court in the exercise of its discretion may choose to hear live testimony

at a suppression hearing rather than rely on the written materials submitted by the

parties.  *See United States v. Batiste*, 868 F.2d 1089, 1091 (9th Cir. 1989) (district court

properly exercised discretion to hold an evidentiary hearing on probable cause to arrest

even though evidentiary hearing was not required where the defendant failed to dispute

any material fact in the government's proffer).  If affidavits show as a matter of law that

defendant is or is not entitled to relief, no evidentiary hearing is required.  *United States v.*

*Irwin*, 612 F.2d 1182, 1187 (9th Cir. 1980).

III.     DISCUSSION

A.     Standing

As an initial matter, the government contends that defendants lack standing to

challenge all the stationary recordings under either the Fourth Amendment or under Title

III, which only allows an "aggrieved person" to move to suppress wiretap evidence.  Opp.

Mot. Suppr. Recordings (doc. no. 86) at 5 (citing *Rakas v. Illinois*, 439 U.S. 128 (1978)

and 18 U.S.C. § 2518(10(a)).  *See* 18 U.S.C. § 2510(11) (an "aggrieved person" means a

person "who was a party to any intercepted wire, oral, or electronic communication or a

person against whom the interception was directed.").  Defendants have submitted

United States District Court
Northern District of California

1    declarations by Casorso and Sanchez, in which they assert that they recognize their

2    voices on specific recordings.  The government has also identified 16 recordings of Victor

3    Marr, Sanchez and/or Casorso.  Wynar Decl. (doc. no. 86-1) ¶ 19; Sambat Decl. (doc.

4    no. 128-1) ¶ 2 and Ex. A.  Having identified specific recordings of their conversations in

5    the record, defendants Victor Marr, Casorso and Sanchez have demonstrated standing

6    under the Fourth Amendment and the wiretap statute to challenge those recordings.

7           However, with respect to Michael Marr, defendants do not dispute the

8    government's representation that Michael Marr was never recorded, but argue that he

9    was identified as a subject of the investigation.  Defendants cite *United States v. Oliva*,

10   705 F.3d 390, 395 (9th Cir. 2012), where the court held that the defendant was one of the

11   individuals "against whom the interception was directed," even though his voice was not

12   verified to be on any of the recordings, where the affidavits in support of the surveillance

13   orders included investigators' statements certifying their beliefs that he was using the

14   individual cellular phones at issue, showing that the defendant's conversations were the

15   target of the surveillance.  Defendants rely on *Oliva* to support their argument that an

16   "aggrieved person" with standing under the wiretap statute is one whose conversations

17   were the target of the surveillance.  Reply Mot. Suppr. Recordings (doc. no. 104) at 2.

18   Although the government did not address Michael Marr's standing argument in its

19   surreply, the court determines that *Oliva* does not expressly recognize a defendant's

20   standing to bring a motion to suppress where he was not actually recorded or was not

21   named in a wiretap application.  Unlike *Oliva*, Michael Marr was not named in a wiretap

22   application, since the government did not seek a wiretap order.

23          Defendants also cite an unpublished opinion, *United States v. Luis*, 537 Fed.

24   Appx. 752, 753 (9th Cir. 2013), which does not support their standing argument for

25   Michael Marr.  There, the defendant moved to suppress recorded conversations with an

26   informant that were recorded with the informant's consent without judicial authorization

27   and by the government's use of wiretaps.  The court held that all of the defendant's

28   conversations were properly intercepted without judicial authorization pursuant to the

informant's consent.  With respect to the wiretaps, the court in *Luis* held that the defendant lacked standing to challenge the interceptions because he was not named in any of the applications and none of his phone calls were intercepted pursuant to a Title III authorization.  The court in *Luis* cited *United States v. Gonzalez, Inc.,* 412 F.3d 1102, 1116 (2005), *amended by* 437 F.3d 854 (9th Cir. 2006), where the court recognized that "[t]he Supreme Court has interpreted these provisions as limiting standing to challenge wiretaps to persons whose Fourth Amendment rights were violated by the interception," and held that the defendants had standing to challenge all conversations intercepted by a wiretap on their business premises, not only their own intercepted conversations, where the defendants owned and leased the building to their family-run business.  In *Alderman v. United States*, 394 U.S. 165, 171-72 (1969), the Supreme Court rejected an expansive view of Fourth Amendment standing urged by the defendants there who argued that "if evidence is inadmissible against one defendant or conspirator, because tainted by electronic surveillance illegal as to him, it is also inadmissible against his codefendant or coconspirator."  The Supreme Court recognized that "[t]he established principle is that suppression of the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence.  Coconspirators and codefendants have been accorded no special standing."  *Id.*

Notwithstanding the court's statement at the hearing, now that the court has had the opportunity to read the cases cited by defendant, in the absence of authority broadly recognizing that a defendant who was under investigation, but was neither intercepted nor named in a wiretap application, qualifies as an "aggrieved person" under the wiretap statute, the court finds that Michael Marr has not demonstrated that he has standing to challenge the warrantless recordings.  Defendants cite no authority broadly construing "a person against whom the interception was directed" to include someone who was under surveillance but had no communications intercepted, was not an owner of the premises where the warrantless interceptions were made, and was not named in a wiretap

United States District Court
Northern District of California

application.  The court further notes that the record indicates that the government agents were informed that Michael Marr never personally attended the rounds but had people representing him; thus he was not even an intended target of the interception.  Wynar Decl., Ex. C at 4-5 (under seal).  The Ninth Circuit has held that standing under the wiretap statute is not broader than Fourth Amendment standing.  "Both the language of the statute and its legislative history make it clear that it does not broaden the rule of standing provided for in [former] Rule 41(e), F.R.Crim.P., relating to Fourth Amendment motions to suppress."  *United States v. King*, 478 F.2d 494, 506 (9th Cir. 1973) (citing 18 U.S.C. § 2510(11); S. Rep. No. 1097, 90th Cong. 2d Sess., quoted in 1968 U.S. Code Cong. & Admin. News at 2179).  The court in *King* concluded that "a defendant may move to suppress the fruits of a wire-tap only if his privacy was actually invaded; that is, if he was a participant in an intercepted conversation, or if such conversation occurred on his premises."  *Id*.

Under the weight of authority discussed here, the Fourth Amendment standing of defendants Victor Marr, Casorso and Sanchez is limited to challenging the interception of conversations in which they participated, and not all the warrantless recordings made in the course of the investigation.  Michael Marr has not demonstrated standing to move for suppression of any of the warrantless recordings.

**B.      Expectation of Privacy**

Defendants contend that they had a reasonable expectation of privacy in their communications outside the courthouses, citing cases recognizing a privacy right in communications made in a public place.  None of the cases are directly on point, to hold that one has a reasonable expectation of privacy in communications at or near a courthouse entrance.

The government concedes that in the course of the bid-rigging investigation, based on information provided by cooperators, the FBI installed stationery microphones in public spaces in the vicinity of the public auctions outside the Alameda County courthouse in Oakland from March 2010 to December 2010, and near the Contra Costa

6

County courthouse in Martinez from June 2010 to December 2010, for the purpose of making recordings around the time of the public foreclosure auctions.  Wynar Decl. (doc. no. 86-1) ¶¶ 8, 14.  The warrantless recordings at issue were recorded on microphones located at the following locations:

- Outside the Alameda County Courthouse (1) inside the lower light box along the courthouse steps of the Alameda County Courthouse on 1225 Fallon Street, Oakland, (2) on vehicles parked in front of the courthouse; and (3) at the bus stop near the courthouse on the corner of Fallon Street and 12th Street, Oakland.

- Outside the Contra Costa County Courthouse (1) on vehicles parked in front of the Contra Costa County Courthouse on 725 Court Street, Martinez, (2) on vehicles parked in front of the staircase near the southwestern corner of the Contra Costa Finance Building on 625 Court Street, Martinez, and (3) along this staircase at 625 Court Street, Martinez.

Sambat Decl. (doc. no. 128-1), Ex. A.  The court takes judicial notice that the Contra Costa Finance Building is directly across the street from the Contra Costa County Courthouse, and that the staircase where two of the recording devices were installed leads from the entrance of the Finance Building to the sidewalk near the corner of the block facing the courthouse.  Sambat Decl., Ex. N.

The government contends that defendants did not have a reasonable expectation of privacy in their public oral communications outside the county courthouses, challenging both their subjective expectation of privacy and the reasonableness of that expectation.  The parties agree that the applicable factors to consider in determining whether an individual can demonstrate a reasonable expectation of privacy are set forth in *Kee v. City of Rowlett*, 247 F.3d 206, 213-15 (5th Cir. 2001)):

(1) the volume of the communication or conversation;

(2) the proximity or potential of other individuals to overhear the conversation;

(3) the potential for communications to be reported;

(4) the affirmative actions taken by the speakers to shield their privacy;

(5) the need for technological enhancements to hear the communications; and

(6) the place or location of the oral communications as it relates to the subjective expectations of the individuals who are communicating.

See *Reynolds v. City and County of San Francisco*, 2012 WL 1143830 at *5 (N.D. Cal. Mar. 30, 2012) (citing *Kee*).

### 1.    Subjective Expectation of Privacy

Defendants contend that their subjective expectation that their conversations would remain private is demonstrated by the secretive and confidential nature of the secondary auctions, citing cases recognizing the subjective expectation of privacy by people attempting to conceal unlawful activity.  See *U.S. v. Nerber*, 222 F.3d 597, 603 (9th Cir. 2000) (affirming finding of subjective expectation of privacy in the defendants' hotel room where, "[i]n addition to closing the door, drawing the blinds, and exercising dominion over the room after the informants left at 10:00 a.m., defendants ingested cocaine and brandished weapons in a way they clearly would not have done had they thought outsiders might see them.").  The evidence in the record does not support an inference that defendants attempted to keep their conversations secret in order to conceal unlawful activity, in light of the evidence that they conducted their rounds in open, public areas and evidence suggesting that defendants did not expect that they could be prosecuted for bid-rigging.  See Patchen Decl. (doc. no. 109-1), Ex. C at 15 (under seal) (indicating that Casorso did not believe his involvement in rounds amounted to bid-rigging).  The government provided evidence that Casorso told the FBI, "If there are 30 bidders present at auction there are usually 12 bidders who are willing to work a deal."  Patchen Decl., Ex. C at 3 (under seal).  The government also offered hearsay in the form of press articles quoting Casorso flagrantly admitting how the secondary rounds

were conducted.  While this evidence may not be admissible at trial on the issue of guilt, the court finds that these statements are consistent with Casorso's statements to the FBI regarding his state of mind.

Defendants Sanchez and Casorso submitted self-serving declarations stating that they believed their conversations were private, but offer no facts to demonstrate their subjective beliefs.  Defendants argue that they took steps to protect their conversations by moving away from other people, standing close together, covering their mouths and speaking in low volumes.  *See* Defs' Resp. to Surreply re Mot. Suppr. Recordings (doc. no. 112) at 3.  Defendants offer no declaration attesting to these attempts to maintain privacy, but defense counsel argued at the hearing that defendants cannot be expected to remember what steps they took to protect the privacy of each conversation that was recorded without their knowledge six years ago.

The evidence in the record, including audio recordings of the intercepted communications, suggests that defendants communicated near the courthouse entrance openly with up to 12 people at a time to work out the secondary auction.  These circumstances do not demonstrate a subjective expectation of privacy, even in light of defendants' conclusory statements that they believed their conversations were private.  In having these conversations, the "rounders" did not leave the vicinity of the public auctions, which were held outside the courthouse just prior to the secondary auction. The auctioneer would typically position himself at the top of the steps or midway on the landing of the steps of the courthouses to conduct the public auctions, which were held weekdays from 12 noon to 12:30 pm at the Alameda County courthouse, and at 10:00 am and 1:30 pm at the Contra Costa County courthouse.  Wynar Decl. ¶¶ 8, 12. Defendants took part in the recorded conversations at or near the courthouse entrance or at the corner bus stop bearing a "County Court House" sign.  Sambat Decl., Exs. G, H, I. Other than defendants' own conclusory statements, there are no reliable facts in the record to support a finding that any defendants had a subjective expectation of privacy in the conversations at issue.

United States District Court
Northern District of California

1

United States District Court
Northern District of California

### 2.      Reasonableness

Even if defendants' conclusory assertions of their subjective expectations were supported by facts, the *Kee* factors render those expectations objectively unreasonable, particularly the factors: proximity or potential of other individuals to overhear the conversation, potential for communications to be reported, and location of the communications, as it relates to their subjective expectations.  Having listened to the recordings at issue, the court finds that defendants did not take steps to protect the privacy of the conversations that were audibly recorded.

### a.      The volume of the communication or conversation

The recordings at issue intercepted defendants' communications that were made at a normal conversational volume level, not in hushed or whispering tones.  Many conversations were conducted by participants in loud voices, sometimes laughing out loud.  In particular, the audio recording of a conversation among a group of about eight to ten men on August 17, 2010, at the Fallon Street bus stop, which was played for the grand jury during the indictment presentation in *United States v. Florida, et al.*, CR 14-582 PJH, reflects that the participants had to project their voices and yell to be heard over the sound of a nearby jackhammer.  Sambat Decl., ¶ 8 and Ex. B, 1D484.002.wav (under seal).  All of the recordings picked up background noise, such as automotive traffic, construction noise, and other conversations from people nearby, which often drowned out the defendants' conversations on the recording.  In the video footage accompanying many of the audio recordings, including the video clip that was played for Witness 1 and the grand jury, the participants are not seen appearing to whisper or covering their mouths when having audible conversations that can be heard on the recording.  Wynar Decl. ¶ 19; Sambat Decl., ¶ 8 and Ex. B, 1D106.003.avi (under seal).  In listening to the audio recordings, the court observed that when a person was speaking at a lowered volume, the recorded communications were not audible or intelligible.  The audible conversations that were recorded were loud enough to be heard by anyone passing by,

10

1 whether at the courthouse entrance or at the bus stop, undermining the reasonableness

2 of any subjective expectation of privacy.

3 **b.    The proximity or potential of other individuals to overhear**

4 **the conversation**

5 The fact that the rounds were conducted in open, public areas close to the

6 courthouse entrance, where the public auctions had just been held, and where various

7 members of the public, including law enforcement officers and attorneys, come and go,

8 does not support a reasonable expectation of privacy under the second *Kee* factor.

9 Defendants suggest that private affairs are routinely discussed outside courthouses,

10 including attorney-client communications.  Mot. Suppr. Recordings (doc. no. 68) at 7.  It is

11 unlikely, and certainly unreasonable, for attorneys to risk breaching their confidential

12 communications with clients by discussing sensitive matters out in the open, in

13 conversational tones, in front of a public forum such as a courthouse, where they could

14 easily be overheard by other attorneys, prosecutors, law enforcement officers, security

15 personnel, court staff, judges, and other bystanders.  As an aside, it has been the court's

16 observation that conversations near the courthouse entrance are frequently overheard by

17 unintended and unseen listeners, even from inside the courthouse.  Defendants cite no

18 authority recognizing an objectively reasonable expectation of privacy in the space

19 immediately outside a courthouse entrance.

20 **c.    The potential for communications to be reported**

21 As noted above, defendants conducted the intercepted conversations at or near a

22 courthouse entrance, where the public foreclosure auction was daily held and where

23 members of the bar and law enforcement officers routinely traversed, exposing them to a

24 high likelihood of being observed and reported.  Furthermore, many of defendants'

25 conversations were conducted with multiple participants, any of whom could have

26 reported the bid-rigging activity.  *See Hoffa v. United States*, 385 U.S. 293, 303 (1966)

27 ("The risk of being overheard by an eavesdropper or betrayed by an informer or deceived

28

United States District Court
Northern District of California

United States District Court
Northern District of California

1  as to the identity of one with whom one deals is probably inherent in the conditions of

2  human society.") (citation and internal marks omitted).

3                   **d.**      **Affirmative actions taken by the speakers to shield their**

4                          **privacy**

5        Defendants have not offered evidence to show affirmative actions taken to protect

6  their privacy, other than suggesting in their brief that they tried moving away from other

7  people, standing close together, covering their mouths and speaking in low volumes.

8  Having listened to the recordings at issue, many of which were accompanied by video

9  images, the court determines that when a speaker spoke in a quiet voice or leaned in to

10  whisper to the listener, the communication was not audibly intercepted by the recording

11  device.  Based on the recorded communications that are audible or intelligible, it is clear

12  that defendants did not take measures to keep their conversations private.  Unlike *Katz*,

13  where the defendant went into a phone booth and closed a glass door to protect his

14  privacy, defendants did not enter an enclosed space but stayed in an open, public area.

15  The photos of the Fallon Street bus stop show that the bus shelter was not closed, but

16  opened to the street, and was located at a busy corner with pedestrian traffic and street

17  traffic.  Sambat Decl., Exs. G, H, I.

18                   **e.**      **The need for technological enhancements to hear the**

19                          **communications**

20        To address the fifth *Kee* factor, the government offers evidence that the FBI used

21  recording devices that picked up only what could be heard by a human ear and did not

22  amplify the conversations.  Wynar Decl. (doc. no. 86-1) ¶ 15(b).  FBI Special Agent

23  Wynar states that the microphones used to make the recordings have the following

24  characteristics: (1) they are omnidirectional, i.e., there is no additional gain in a particular

25  direction; (2) the microphones lack equalization or noise cancellation; (3) the minimum

26  sound pressure level detectable by the microphone is limited by its own electrical noise,

27  which is specified by the manufacturer as 33.0dB (A-weighted), maximum, and (4) they

28  are less sensitive than a healthy human ear.  Wynar Decl. (doc. no. 86-1) ¶ 15(b).  The

evidence shows that the intercepted conversations could be overheard by a human ear. *See U.S. v. Fisch*, 474 F.2d 1071, 1077 (9th Cir. 1973) (per curiam) (finding no reasonable expectation that conversations in hotel room would not be heard in the next room, noting that the "officers were in a room open to anyone who might care to rent [and] were under no duty to warn the appellants to speak softly, to put them on notice that the officers were both watching and listening.").  As noted earlier, the sound quality of the audio recordings reflect that the recording devices only picked up voices in conversational or loud tones, and not hushed or whispered voices.

> f.   **The place or location of the oral communications in relation to the subjective expectations of the individuals who are communicating**

Given the proximity of defendants to the courthouse entrance, which was the site of the public auction, when they conducted communications about the secondary auctions, the context of the conversations does not support a legitimate expectation of privacy.

While the court agrees with defendants that it is at the very least unsettling that the government would plant listening devices on the courthouse steps given the personal nature of many of the conversations in which people exiting the courthouse might be engaged, it is equally unrealistic for anyone to believe that open public behavior including conversations can be private given that there are video cameras on many street corners, storefronts and front porches, and in the hand of nearly every person who owns a smart phone.  There are no cases which establish a bright line rule one way or the other. Instead, the court is required to apply the *Kee* factors to the evidence of record.  Based upon a review of that evidence, the court cannot find that any subjective expectation of privacy held by defendants was objectively reasonable.  Accordingly, the court finds that the warrantless recording of defendants' conversations did not violate their rights under the Fourth Amendment or under the wiretap statute.  The court need not reach the taint

issue and defendants are not entitled to an evidentiary hearing.  The motion to suppress is therefore DENIED.

### C.    Record on Taint

Although defendants' Fourth Amendment rights are not implicated by the recordings at issue due to the lack of a reasonable expectation of privacy in the recorded conversations, the court makes the following observations about the evidence that has been developed in the record addressing defendants' arguments about possible taint, which may provide guidance to the parties and inform their trial strategy.

The government has identified the uses made of the recordings at issue during the course of the investigation and presentation of the indictment.  The government has provided declarations addressing defendants' concerns whether any confidential sources may have been persuaded to cooperate based on the illegal recordings, or whether any witnesses or lawyers were informed of the recordings as part of a reverse proffer by the government lawyers to induce cooperation.

### 1.    Cooperating Witnesses

The FBI played five stationary courthouse recordings to four witnesses, three of whom heard recordings that may have captured the voices of Gregory Casorso, Javier Sanchez and Victor Marr.  Wynar Decl. (doc. no. 86-1) ¶¶ 19, 22.  Each of those three witnesses had been interviewed several times prior to being shown audio/video recordings in October 2014, and each of them had already entered a guilty plea pursuant to a cooperation agreement.  Wynar Decl. (doc. no. 86-1) ¶¶ 23-25.  The information about defendants' recorded conversations that were played for witnesses, and information about each witness's plea entry on the public docket, is summarized as follows:

| Witness | FBI Interview Date | Plea Entry Date for Witness | Possible Recorded Defendants | Excerpt of witness interview summary filed under seal with Wynar Decl. (doc. no. 86-1) |
|---|---|---|---|---|
| (1) Jorge Wong | 10/8/14 (previously | 10/12/11 in case | Victor Marr, | Ex. J: Prior to the commencement of the interview, Wang [sic] and |

United States District Court
Northern District of California

| (represented by Gail Shifman) | interviewed 6 times) | number CR11-428 | Javier Sanchez | Shifman reviewed an audio/video recording (1D106.003) privately. The video showed Wong participating in a secondary auction, also known as a "round" with Vic Marr, Sanchez, and others. . . . Wong identified Vic Marr and Sanchez in the video. |
|---|---|---|---|---|
| (2) Joseph Vesce (represented by James Lassart) | 10/17/14 (previously interviewed 4 times) | 8/7/13 in case number CR13-415 | Javier Sanchez | Ex. K: During the interview Vesce was shown documents and audio and video recordings. . . 1D619.001 part1.wav (audio), 1D611 (video). . .Vesce identified the conduct in this audio/video recording as Wong, Sanchez, Heisner, Renquist, Vesce and Nick Diaz participating in a round. |
| (3) Brian McKinzie (represented by William DuBois) | 10/24/14 (previously interviewed 7 times) | 11/23/11 in case number CR11-424 | Victor Marr, Gregory Casorso | Ex. L: McKinzie was shown documents and audio and video recordings . . . 1D402.002.wav. After reviewing this audio recording McKinzie identified the conduct as a secondary auction, also known as a "round" being conducted for the Lobelia Way property.  McKinzie did not hear the voice of Vic Marr but Vic Marr had a position, also known as a "seat" in the round. |

*See* Wynar Decl., Exs. J, K, L.  Under these circumstances, the court finds no material issue whether the recordings would have influenced the witnesses' decision to cooperate, given that each of them had already pled guilty and agreed to cooperate with the government before being shown the courthouse recordings.

>          2.      **Grand Jury**

The government represents that on November 19, 2014, the grand jury was shown a stationary audio/video recording capturing Sanchez and Victor Marr's voices on March 19, 2010, identified as 1D106.003, during the indictment for this case.  Sambat Decl. ¶ 8. Another stationary recording that captured Casorso's voice on August 16, 2010, identified as 1D484.002, was provided to the grand jury during the indictment for *United States v. Florida* on November 18, 2014.  *Id.*  The court notes that both here and in *Florida*, the

1   grand jury returned the indictment on the same day that the recording was played.  The

2   government represents that no additional subpoenas or testimony were sought by the

3   grand jury after reviewing the recordings.  Sambat Decl. ¶ 10.

4          It is well-settled that unlawfully seized evidence is admissible before a grand jury.

5   *United States v. Calandra*, 414 U.S. 338, 344-45, 348-52 (1974) ("The grand jury's

6   sources of information are widely drawn, and the validity of an indictment is not affected

7   by the character of the evidence considered.").  *See also U.S. v. Williams*, 504 U.S. 36,

8   50 (1992) (noting that in *Calandra,* challenging physical evidence the government had

9   obtained through a violation of the Fourth Amendment, "we rejected the proposal that the

10  exclusionary rule be extended to grand jury proceedings, because of 'the potential injury

11  to the historic role and functions of the grand jury.'"); *U.S. v. Zielezinski*, 740 F.2d 727,

12  732 (9th Cir. 1984) (citing *Calandra* as authority that "challenges to indictments will not be

13  heard where they rest on objections to the evidence-gathering process," as distinct from

14  challenges based on improprieties within the grand jury process itself).  Defendants'

15  Fourth Amendment concerns are therefore not implicated by the grand jury's exposure to

16  the warrantless recordings.

17         **3.      Lawyers**

18         The government represents that on March 21, 2013, the government played a

19  stationary audio recording capturing Casorso's voice at the Fallon Street bus stop,

20  identified as 1D430.001, to an attorney representing then-target John Shiells, in an effort

21  to reach a pre-indictment resolution with Shiells.  Sambat Decl. (doc. no. 128-1) ¶ 6.

22  Shiells was subsequently indicted on November 19, 2014, and pleaded guilty to bid

23  rigging and mail fraud on July 8, 2015, pursuant to a cooperation deal with the

24  government.  *See United States v. John Shiells, et al.*, CR 14-00581 PJH.  The court

25  notes that this particular use of a stationary recording is the only one presenting a

26  potential issue of taint, but there is no evidence in the record on the question whether

27  playing this audio recording for Shiells' attorney influenced Shiells' decision to cooperate,

28  or whether any evidence was obtained as a direct result of his cooperation.  *See U.S. v.*

United States District Court
Northern District of California

16

*Huberts,* 637 F.2d 630, 638 (9th Cir. 1980) (discussing exclusionary rule and exceptions to the rule) (citing *Wong Sun v. United States,* 371 U.S. 471, 488-89 (1963)).  Because the court has found that defendants did not have a legitimate expectation of privacy in the recorded conversations, it does not reach the issue of taint with respect to any evidence derived from Shiells.

## IV.    CONCLUSION

For the foregoing reasons, defendants' motion to suppress the warrantless audio recordings is DENIED.

**IT IS SO ORDERED.**

Dated:  July 22, 2016

_____
PHYLLIS J. HAMILTON
United States District Judge