UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

          Plaintiff,

     v.

MICHAEL MARR,
JAVIER SANCHEZ,
GREGORY CASORSO, and
VICTOR MARR,

          Defendants.

Case No.  14-cr-00580-PJH

**PRETRIAL ORDER NO. 5**

On April 19, 2017, this matter came on for pretrial conference and for hearing on Victor Marr's motion to continue trial.  The court previously held a hearing and ruled on defendants' motions to sever in the order entered October 12, 2016, which is hereby designated as Pretrial Order No. 4 (doc. no. 186).  As stated on the record and summarized below, the court rules on the motions in limine and other disputed pretrial matters as follows:

I.    **Victor Marr's Motion to Continue Trial**

      Counsel for Victor Marr, Teresa Caffese, seeks a continuance of trial due to a scheduling conflict with criminal trial proceedings in state court.  Doc. no. 240.  At the pretrial conference, Ms. Caffese asked the court to defer ruling on her request to continue until the state court ruled on a pending motion to sever which would delay those state court proceedings.  On April 24, 2017, Ms. Caffese informed the court that the state court denied the motion to sever and that she remained in trial.  Due to Ms. Caffese's demonstrated inability to appear on the trial date set in this case, the court ORDERS that

United States District Court
Northern District of California

defendant Victor Marr is severed for trial from defendants Michael Marr, Javier Sanchez and Gregory Casorso pursuant to Rule 14 of the Federal Rules of Criminal Procedure and GRANTS Victor Marr's request for a continuance of trial. The court's pretrial rulings in this case remain binding on Victor Marr.

As the court proposed at the pretrial conference, with no objection, the court hereby ORDERS that defendant Victor Marr is joined for trial, pursuant to Rule 13, with the defendant in *U.S. v. Ramin Rad "Ray" Yeganeh,* CR 15-339 PJH, on the ground that both Victor Marr and Yeganeh are charged with bid rigging in Alameda County in violation of the Sherman Act, and could have been joined in a single indictment. The court further determines, based on the court's familiarity with evidence admitted in related bid rigging trials, that joinder would not unduly prejudice the parties because a significant amount of evidence admissible against one defendant would be admissible against the other defendant in separate trials. Accordingly, Victor Marr's trial is continued to August 14, 2017; he will be tried jointly with Yeganeh.

Having determined that failure to grant Victor Marr's request for a continuance would unreasonably deny him continuity of counsel, the court instructs the government to prepare a proposed order excluding time under the Speedy Trial Act.

## II.     Motions in Limine ("MIL")

### A.     Defendants' Motions in Limine

#### 1.     Defendants' Joint MIL to Admit Testimony Regarding Analysis of Auction Sale Prices

Defendants seek to admit testimony and evidence regarding the analysis by their consultant, Jeffrey Andrien, of auction sale prices during and after the conspiracy period, despite the court's earlier ruling in Pretrial Order No. 2 denying defendants' motion to adjudicate the Sherman Act count pursuant to the rule of reason. Doc. no. 209. Defendants contend that they should be permitted to refute the allegations of the indictment that they suppressed competition by "purchasing selected properties at public auctions at artificially suppressed prices." Defendants also contend that the

government's theory of the case, as argued in both trials in the related case *U.S. v. Florida*, CR 14-582 PJH and CR 14-582 JD, is that the difference between the public auction price and the secondary auction price would have gone to the beneficiaries, which is mere speculation based on anticipated testimony of cooperating witnesses that they would have bid more at the public auction but for the secondary auctions or rounds. Defendants argue that Jeffrey Andrien's analysis will disprove the government's key allegation that the secondary auction prices would have otherwise been added to the public auction bid prices.

In further support of defendants' motion in limine to admit the Andrien testimony is their separate brief in support of (1) defendants' proposed instruction requiring the jury to find "unreasonable restraint" as an element of bid rigging and (2) defendants' request to admit evidence whether the alleged agreement resulted in an unreasonable restraint. Doc. no. 212. Defendants contend that a conclusive presumption of unreasonableness under the per se rule violates their rights to due process and jury determination on the element of an unreasonable restraint of trade to prove a Sherman Act violation. Doc. no. 212. Because this due process argument in support of defendants' proposed jury instruction is relevant to defendants' motion in limine to admit Andrien's testimony, and other disputed pretrial matters, the court addresses it at the outset.

### a.    Challenges to Per Se Rule

Defendants contend that excluding evidence of whether defendants' alleged bid rigging agreement restrained competition or suppressed prices at the public auctions would violate their right to due process and right to have a jury determine an essential element of the Sherman Act counts, namely, whether the alleged bid rigging was an unreasonable restraint of trade. In their brief in support of their proposed instruction on "unreasonable restraint" and their request to admit rule of reason evidence, doc. no. 212, defendants make the following arguments:

(1) that unreasonableness of restraint of trade is a necessary element of a criminal violation of Section 1 of the Sherman Act under *Standard Oil Co. v. United*

3

*States*, 221 U.S. 1 (1911), despite 77 years of controlling authority, under *U.S. v. Socony-Vacuum Oil Co.*, 310 U.S. 150 (1940) and its progeny, recognizing that price-fixing is conclusively presumed to be unreasonable and constitutes per se unreasonable restraint of trade under Section 1; and

(2) that despite controlling Ninth Circuit authority holding that "[t]he per se rule does not operate to deny a jury decision as to an element of the crime charged, since 'unreasonableness' is an element of the crime only when no per se violation has occurred," *U.S. v. Manufacturers' Ass'n of the Relocatable Bldg. Ind.*, 462 F.2d 49, 52 (9th Cir. 1972) ("*Manufacturers' Ass'n*"), the development of due process jurisprudence, recognizing a defendant's right to a jury determination on every element of the crime with which he is charged, directly conflicts with the *Socony-Vacuum* per se rule, requiring the issue of the reasonableness of the combination in restraint of trade to be decided by the jury under an appropriate "rule of reason" instruction.

Under this line of reasoning, defendants urge the court to disregard *Manufacturers' Ass'n,* in which the Ninth Circuit squarely rejected a due process challenge to the *Socony-Vacuum* per se rule, on the ground that it has been effectively overruled by subsequent Supreme Court authority holding that a criminal defendant has a due process right to have a jury, not a judge, decide whether every element of a charged offense has been proven. In *Manufacturers' Ass'n*, the defendants appealed from their convictions in the Northern District of California for violating antitrust laws, on the ground that the per se rule as to price-fixing creates a conclusive presumption in violation of their rights to due process. The Ninth Circuit recognized that "since the accused is presumed innocent, he has the right to have each element of the crime charged submitted to the jury," and that "[c]onclusive presumptions may not operate to deny this right." 462 F.2d at 50 (citing *Morissette v. United States*, 342 U.S. 246 (1952)).

Addressing the appellants' due process challenge to application of the per se rule, i.e., "that price-fixing is per se a violation of the antitrust laws and that the test of

reasonableness has no application," the Ninth Circuit held that the "[a]ppellants' contention that the per se rule constitutes an unconstitutional conclusive presumption misunderstands the Sherman Act." *Id.* The court proceeded to explain that in interpreting the Sherman Act, the Supreme Court has enunciated two distinct rules of substantive law: "(1) certain classes of conduct, such as price-fixing, are, without more, prohibited by the Act; (2) restraints upon trade or commerce which do not fit into any of these classes are prohibited only when unreasonable." *Id.* at 52. In other words, "the per se rule establishes a conclusive presumption that certain types of conduct are unreasonable" within the meaning of the Sherman Act, such as price-fixing agreements. *Id.* The court in *Manufacturers' Ass'n* squarely held that there is no right to a jury determination of unreasonableness for a per se violation:

> *Morissette, supra,* is inapposite. The per se rule does not operate to deny a jury decision as to an element of the crime charged, since "unreasonableness" is an element of the crime only when no per se violation has occurred. To put it differently "reasonableness" must be viewed as a legal term, and not in its ordinary sense. When the Court describes conduct as per se unreasonable, they do no more than circumscribe the definition of "reasonableness."
>
> While the appellants deserve credit for their ingenious and novel attempt to trap the Court in its own rhetoric, their contention that the per se rule should be set aside must be, and is rejected. The per se rule does not establish a presumption. It is not even a rule of evidence.

462 F.2d at 52.

Other circuit courts have cited *Manufacturers' Ass'n* with approval to hold that the per se rule does not deprive a defendant of the right to have each element of the offense submitted to the jury. *See United States v. Giordano*, 261 F.3d 1134, 1144 (11th Cir. 2001) (citations omitted); *United States v. Fischbach & Moore, Inc.*, 750 F.2d 1183, 1196 (3d Cir. 1984) (citations omitted). The government points out that every court of appeals to reach the question has similarly concluded that the per se rule is a matter of substantive law, and does not deprive the defendant of the right to jury trial. Doc. no. 235 at 2. *See United States v. Cargo Serv. Stations, Inc.*, 657 F.2d 676, 683-84 (5th Cir. 1981) ("because fixing prices is by itself an unreasonable restraint of trade, an intent to fix

prices is equivalent to an intent to unreasonably restrain trade"); *United States v. Koppers Co.*, 652 F.2d 290, 294 (2d Cir. 1981) ("Since the Sherman Act does not make 'unreasonableness' part of the offense, it cannot be said that the judicially-created per se mechanism relieves the Government of its duty of proving each element of a criminal offense under the Act."); *United States v. Brighton Bldg. & Maint. Co.*, 598 F.2d 1101, 1106 (7th Cir. 1979) ("Since the per se rules define types of restraints that are illegal without further inquiry into the competitive reasonableness, they are substantive rules of law, not evidentiary presumptions. It is as if the Sherman Act read: 'An agreement among competitors to rig bids is illegal.'").

In support of their argument that the court should hold that *Manufacturers' Ass'n* has been effectively overruled by subsequent Supreme Court authority expanding on the rights to due process and jury trial, defendants cite a line of cases starting with *Carella v. California*, 491 U.S. 263 (1989) (per curiam), where the Court held that jury instructions imposing conclusive presumptions as to core elements of the crime violated the defendant's right under the Due Process Clause of the Fourteenth Amendment, which "denies States the power to deprive the accused of liberty unless the prosecution proves beyond a reasonable doubt every element of the charged offense." 491 U.S. at 265 (citing *In re Winship*, 397 U.S. 358, 364 (1970)). The Court in *Carella* cited clearly established Supreme Court authority recognizing that "[j]ury instructions relieving States of this burden violate a defendant's due process rights." *Id.* (citing *Francis v. Franklin*, 471 U.S. 307 (1985); *Sandstrom v. Montana*, 442 U.S. 510 (1979)). *Sandstrom*, in turn, relied on the holdings of *Morissette*, 342 U.S. at 274-75 (instruction that criminal intent was presumed from defendant's conduct "would conflict with the overriding presumption of innocence with which the law endows the accused and which extends to every element of the crime"), and *U.S. v. United States Gypsum Co.*, 438 U.S. 422, 435 (1978) ("intent is an element of a criminal antitrust offense which must be established by evidence and inferences drawn therefrom and cannot be taken from the trier of fact

United States District Court
Northern District of California

through reliance on a legal presumption of wrongful intent from proof of an effect on prices"). *See Sandstrom*, 442 U.S. at 521-22.

Given this long line of cases recognizing that essential elements of the crime must be found by the jury, defendants do not raise a persuasive argument that this court should determine that decisions from *Winship* through *Sandstrom, Francis, Carella* and *Apprendi v. New Jersey*, 530 U.S. 466, 477 (2000) "effected a sea change in understanding and applying a criminal defendant's right to Due Process" that "flatly precludes reliance on the per se rule here." Doc. no. 212 at 14, 16. The due process principles that defendants contend contravene the per se rule were considered by the court in *Manufacturers' Ass'n*, which cited *Morissette* as authority on the right to have every element of the crime submitted to the jury. *See Morissette*, 342 U.S. at 276 ("Whether that intent existed, the jury must determine, not only from the act of taking, but from that together with defendant's testimony and all of the surrounding circumstances."). Accordingly, the court declines defendants' invitation to disregard the holding of *Manufacturers' Ass'n* that "[t]he per se rule does not operate to deny a jury decision as to an element of the crime charged." 462 F.2d at 52.

### b. Relevance

Defendants contend that they are entitled to defend the factual allegations made in the indictment, i.e., that defendants "artificially suppressed" prices at the public auction. Doc. no. 209 at 5-6 (citing *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) ("the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense") (internal citation and marks omitted)). *See* Indictment ¶¶ 10.d, 25.d. Defendants proffer Andrien's analysis of auction sale prices in Alameda and Contra Costa Counties, during and after the conspiracy period alleged in the indictment. Defendants contend that Andrien's analysis is based on an analytical model that is widely accepted for assessing the economic impact of alleged anticompetitive conduct in the marketplace, generally referring to MDL litigation without citing court opinions recognizing the purported methodology.

1    Defendants also contend that their analysis of auction sale prices will undercut the

2    government's theory that the properties would have been sold at the secondary auction

3    prices.  Defendants point out that the secondary auction bidders told the FBI that one

4    reason they participated in the secondary auctions was to make money from each other,

5    with no intent to purchase the properties, suggesting that the bidding at the secondary

6    rounds would have had no bearing on the prices bid at the public auction.  Defendants

7    argue that the participants' practice of selling each other insurance at the secondary

8    auctions demonstrates that the insured bidder had no interest in purchasing the property,

9    but only to bid in the secondary rounds to drive up the price as high as he could to inflate

10   the price to other bidders.  Defendants further point to the practice of some bidders to

11   have two "seats" at the secondary rounds, which amounts to a method of inflating the

12   price of the property to other bidders at the rounds, to make more money from other

13   bidders in the rounds, with no bearing on the prices bid at the public auction.  Doc. no.

14   209 at 3-4.

15   The government opposes the defense motion to admit Andrien's testimony

16   generally on the ground that a bid rigging conspiracy is a per se violation of the Sherman

17   Act, and that evidence of the economic effect is irrelevant, and therefore inadmissible.

18   The allegation that the conspiracy "artificially suppressed prices" does not go to an

19   essential element of the crime, and the government is not required to prove all the

20   allegations of the indictment.  "The cases make clear that the government need not prove

21   all facts charged in an indictment; instead, only enough facts to prove the essential

22   elements of the crime must be demonstrated at trial."  *U.S. v. Jenkins*, 785 F.2d 1387,

23   1392 (9th Cir. 1986) (citations omitted).

24   Each bid rigging charge requires the jury to find the following three elements:

25   (1) an agreement to rig bids; (2) defendants knowingly participated in the agreement; and

26   (3) their activities were in the flow of or affected interstate commerce.  Because evidence

27   of reasonableness or pro-competitive justification for bid rigging is not relevant in a per se

28   case, it is not admissible under FRE 402.  "Insofar as the language of an indictment goes

8

beyond alleging elements of the crime, it is mere surplusage that need not be proved."

*Id.* (proof of federal insurance is not an essential element of the crimes charging false statements to obtain loans insured by the FHA, and allegations that appellants' false statements were directed to an FHA-approved lender were surplusage that did not have to be proved at trial). *See also United States v. Miller*, 471 U.S. 130, 136 (1985) ("[a]s long as the crime and the elements of the offense that sustain the conviction are fully and clearly set out in the indictment, the right to a grand jury is not normally violated by the fact that the indictment alleges more crimes or other means of committing the same crime").

Even if defendants were permitted to rebut the allegations of the indictment related to artificially suppressed prices, the government argues that Andrien's analysis is irrelevant to the question whether the bid rigging conspiracy suppressed the prices of the selected properties and diverted money away from the banks and beneficiaries to the coconspirators, because Andrien analyzes the prices paid for ALL properties sold at the auctions, not the prices of the selected properties that were rigged, which are the subject of the indictment. Doc. no. 236 at 9. As the court held in the *Florida* pretrial proceedings, Andrien's analysis of the prices of all properties sold at public foreclosure auctions is irrelevant to the agreement to rig bids on selected properties as alleged in the indictment:

> The analysis proposed by defendants comparing post-conspiracy auction sales prices with the prices of all properties sold at auction during the charged time period is not relevant to the prices of the set of selected properties that defendants actually purchased. Thus, the analysis described by defendants is inadmissible as irrelevant pursuant to FRE 402.

*Florida I*, CR 14-582 PJH, doc. no. 284 at 6. The government points out that it has not noticed an economic expert as a trial witness, and has no intention to present statistical economic evidence on the prices of properties sold at auction to prove that defendants artificially suppressed prices. Doc. no. 236 at 11.

Defendants also argue that they are entitled to refute evidence and argument that coconspirators believed they could purchase properties for a lower price by participating

in the rounds, when the evidence shows that many bidders at the rounds had no intent to purchase the properties, but participated in the rounds to drive up the secondary auction price to make money off of other bidders. The government responds that the evidence of the coconspirators' subjective beliefs, that they would economically benefit from bid rigging, is relevant to their motive for joining the conspiracy. The government would not offer evidence of their subjective beliefs to prove that bid rigging conspiracy actually lowered the price of the properties at public auction. Furthermore, Andrien's analysis would not be probative of the subjective beliefs of the coconspirators, and would not be relevant rebuttal evidence on that issue. Doc. no. 236 at 12-13.

The court determines that any analysis by Andrien about the effect of the bid rigging agreement on the auction prices would be irrelevant and is therefore inadmissible pursuant to FRE 402 ("Irrelevant evidence is not admissible."). The Andrien testimony is also inadmissible pursuant to FRE 403 because it is prejudicial and is likely to cause confusion of the issues.

### c. Opinion Testimony

The government further objects to the admissibility of Andrien's analysis of auction sales prices as inadmissible opinion testimony because his analysis is not reliable and is not relevant to qualify as expert testimony. Doc. no. 236.

It is undisputed that Andrien is not a percipient witness and that his testimony is not admissible under FRE 701, which provides:

> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:
>
> (a) rationally based on the witness's perception;
>
> (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and
>
> (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Defendants must establish the admissibility of Andrien's opinion testimony under FRE 702, which provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

On this record, defendants have not established that Andrien's opinion testimony "rests on a reliable foundation and is relevant to the task at hand" to be admissible under FRE 702. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993) ("*Daubert I*"). In addition to the lack of relevance, discussed above, defendants have not established the reliability of Andrien's testimony by a preponderance of the evidence. *See Daubert I*, 509 U.S. at 593 (factors the court can consider in determining whether to admit expert scientific testimony under FRE 702 include whether the theory or technique employed by the expert is generally accepted in the scientific community; whether it's been subjected to peer review and publication; whether it can be and has been tested; and whether the known or potential rate of error is acceptable). The government points out several factors that undermine the reliability of Andrien's testimony:

i. Andrien has experience in business management, marketing and IP, but is not an economic expert, and does not have specialized knowledge in economics or economic modeling. His field of expertise appears to be in marketing, business management and intellectual property, but he does not appear to have any prior experience analyzing the real estate market.

ii. Defendants do not show that Andrien's methodology has been subject to peer review, or "point to some objective source—a learned treatise, the policy statement of a professional association, a published article in a reputable scientific journal or the like—to show that they have followed the scientific method, as it is

United States District Court
Northern District of California

practiced by (at least) a recognized minority of scientists in their field." *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 43 F.3d 1311, 1319 (9th Cir. 1995) ("*Daubert II*"). The government points out that Andrien's analysis fails to cite economic literature that has analyzed collusion in auction settings. Doc. no. 236 at 4 and n.1 (citations omitted). The government adds that defendants do not cite any bid rigging cases or a specific expert opinion that has employed Andrien's model, noting that defendants argue only generally that it is the "same basic model used in damage analysis in a wide range of federal and state cases." *Id.* at 5.

iii. Andrien's work was done specifically for this litigation, and did not grow "naturally and directly out of research they have conducted independent of the litigation." *Daubert II,* 43 F.3d at 1317 ("in determining whether proposed expert testimony amounts to good science, we may not ignore the fact that a scientist's normal workplace is the lab or the field, not the courtroom or the lawyer's office").

iv. Andrien's analysis is flawed because he did not properly take variables into account, such as the effect of the recession, seasonality, availability of financing, and regional and demographic changes that affect housing prices. Doc. no. 236 at 6-7. Andrien also fails to explain why he only included 6 months of data for the post-conspiracy period ("Post-Period") to compare to the two-year conspiracy period ("Indictment Period"), and did not analyze housing prices before the conspiracy at all.

v. Andrien's analysis does not support his conclusion that auction prices slightly decreased after the conspiracy period so that the banks received less during the post-conspiracy period compared to the conspiracy period, because it fails to analyze the dollar amounts that the banks received, focusing only on the percentages paid over the opening bid. The government also challenges Andrien's conclusion that there is no evidence to suggest that auction prices were suppressed by the bid rigging, because he did not measure what prices should have been during the indictment period for the properties that were rigged, and

1  only compared the prices of ALL properties offered at the auctions during the

2  Indictment Period against the prices Post-Period.

3  Because defendants fail to demonstrate the admissibility of Andrien's opinion testimony

4  under FRE 702, defendants' motion in limine to admit Andrien's testimony is DENIED.

5  ### 2.    Defendants' Motion for Extra Peremptory Challenges

6  Defendants jointly move for four additional peremptory challenges, one for each

7  defendant, in addition to the 10 peremptory challenges as provided in Fed. R Crim. P. 24.

8  Doc. no. 217.  Rule 24(b) authorizes the court in multi-defendant cases to grant additional

9  peremptory challenges to the defendants, "and may allow the defendants to exercise

10  those challenges separately or jointly."  The commentary further notes, "If the court does

11  so, the prosecution may request additional challenges in a multi-defendant case, not to

12  exceed the total number available to the defendants jointly. The court, however, is not

13  required to equalize the number of challenges where additional challenges are granted to

14  the defendant."

15  Given that this case involves multiple defendants charged in two separate

16  conspiracies, the court determines as a discretionary matter that two additional

17  peremptory challenges are warranted, giving defendants twelve peremptory challenges to

18  exercise jointly, plus the one additional peremptory challenge allowed for two alternate

19  jurors under Rule 24(c).

20  ### 3.    Casorso and Victor Marr's Motion for Limiting Instructions

21  Defendants Gregory Casorso and Victor Marr are charged only in Count One with

22  conspiring to rig bids at Alameda County foreclosure auctions, and move for the court to

23  give a limiting instruction each time a statement is admitted as a coconspirator statement

24  against Michael Marr and Javier Sanchez in furtherance of the Contra Costa County

25  conspiracy charged in Count Six.  Doc. no. 215.  The government responds that this

26  proposal is excessive, and argues that proper jury instructions and the verdict form are

27  sufficient to minimize the risk that either Casorso or Victor Marr would be found guilty

28  based on evidence related to Contra Costa County.  Doc. no. 234.

Given the government's concession that certain evidence substantially or exclusively relates to alleged bid rigging activity in Contra Costa County, the court will give a limiting instruction to avoid undue prejudice to Casorso and Victor Marr when alerted by the parties that a limiting instruction is proper as to a particular witness or set of exhibits, but will not give a limiting instruction each time a coconspirator statement in furtherance of the Contra Costa County conspiracy is admitted.  As the court indicated at the hearing, the following limiting instruction will be given in this trial:

> You are about to hear [or you have heard] evidence relating to the alleged Contra Costa County conspiracy,  This evidence may only be considered against defendants Michael Marr and Javier Sanchez, and cannot be considered against defendant Gregory Casorso.

To the extent that such a limiting instruction is appropriate in Victor Marr's joint trial with Yeganeh, this instruction will be modified accordingly.  Casorso and Victor Marr's motion for a limiting instruction is therefore GRANTED.

### 4.   Disclosure Requests in Defendants' Joint Pretrial Conference Statement

In their pretrial conference statement, doc. no. 216, defendants asked the court to verify that the government has made certain disclosures, and the government confirmed at the pretrial conference that it has disclosed the documents in its possession.

### 5.   Defendants' Joint Response to Notice of Intent to Introduce FRE 404(b) Evidence

Defendants filed a response to the government's notice of intent to introduce evidence of other acts of Michael Marr and Gregory Casorso pursuant to FRE 404(b). Doc. nos. 222, 232.  The government asserts that the evidence is admissible as "inextricably intertwined" with the charged bid rigging conspiracies, but filed the FRE 404(b) notice as a cautionary measure.  The government's notice states that it anticipates introducing the following evidence:

i. Keith Slipper, a coconspirator, will testify that during a meeting with Michael Marr in the mid-2000's, before the time periods charged in the indictment

1  starting June and July 2008, (a) Marr offered to pay Slipper a commission of

2  $5,000 per property Slipper purchased on Marr's behalf plus 10% of money

3  collected for rounds; and (b) Marr responded to Slipper after Slipper informed him

4  of the illegality of the rounds.

5       ii. Documents that mention Casorso's participation in Contra Costa County

6  bid rigging, such as round sheets, and witness testimony that Casorso participated

7  in bid rigging conduct in Contra Costa County on behalf of Marr, for whom

8  Casorso worked.

9       Defendants argue that the Slipper testimony is neither admissible as inextricably

10  intertwined nor admissible under FRE 404(b).  By letter to the court, defendants withdrew

11  their objection to Slipper's testimony on the ground of lack of notice, noting that the

12  government identified Slipper's statements in the 302 interview reports.

13       With respect to the Casorso evidence, defendants do not object to admitting

14  limited evidence of Casorso's participation in the Contra Costa County auctions, subject

15  to the following limitations: (a) it is confined to the period charged in the indictment; and

16  (b) it is accompanied by an appropriate limiting instruction that such evidence may be

17  considered as explaining events relating to the alleged Contra Costa County conspiracy,

18  but may not be considered as evidence of Mr. Casorso's propensity to engage in bid

19  rigging in Alameda County.  The court adopts these proposed limitations on admitting the

20  Casorso evidence.

21          **a.**    **Inextricably Intertwined**

22       With respect to the Slipper evidence, defendants object to Slipper's testimony

23  being offered as "inextricably intertwined" on the grounds that it is not "part of" the

24  charged offenses, and is not reasonably necessary for the prosecution to present or

25  explain its case.  *See United States v. Vizcarra-Martinez*, 66 F.3d 1006, 1012-13 (9th Cir.

26  1995).  Defendants point out that the meeting between Marr and Slipper occurred about

27  three years before the charged conspiracy, making it too far removed in time to be

28  considered "part of" the bid rigging conspiracy.  *United States v. Anderson*, 741 F.3d 938,

(holding that other act "which occurred six months after the charged conduct took place, is arguably too far removed in time to constitute a part of the charged transaction," but was admissible as intrinsic to the offense in that it was reasonably necessary for the prosecution to tell a clear and comprehensible story).

Defendants also contend that the Slipper evidence is not necessary to provide "context" because no evidence indicates that Slipper agreed to do anything that Marr purportedly asked, and Marr's purported offer did not envision an agreement to rig bids at public auctions in Alameda or Contra Costa Counties. Without an indication that Marr's offer of a percentage of the rounds was connected to any agreement to rig bids, the evidence is not necessary to tell a comprehensible story. The government has not shown that it would have difficulty in presenting the evidence of the charged crimes without offering evidence of the other acts. Thus, defendants' objection to admitting the Slipper testimony as "inextricably intertwined" is SUSTAINED.

### b.    FRE 404(b)

Alternatively, the government argues that the proffered testimony and documents would be admissible under FRE 404(b) to show Michael Marr's intent, knowledge, lack of mistake and modus operandi of the bid rigging conduct. Rule 404(b) provides as follows:

> **(b) Crimes, Wrongs, or Other Acts**.
>
> **(1) Prohibited Uses.** Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.
>
> **(2) Permitted Uses; Notice in a Criminal Case**. This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. On request by a defendant in a criminal case, the prosecutor must:
> (A) provide reasonable notice of the general nature of any such evidence that the prosecutor intends to offer at trial; and
> (B) do so before trial--or during trial if the court, for good cause, excuses lack of pretrial notice.

As the court held in *U.S. v. King*, 200 F.3d 1207, 1214 (9th Cir. 1999)*,* "evidence of prior bad acts is admissible if: (1) there is sufficient evidence to allow the jury to conclude that

the defendant committed the prior act; (2) the act was not too remote in time from the commission of the charged offense; (3) the act is similar to the charged offense; (4) the act is introduced to prove an element of the charged offense that is a material issue in the case; and (5) the act's probative value is not outweighed by its potential prejudice."

The Slipper testimony about his conversation with Marr in the mid-2000's is remote in time from the conspiracies charged in the indictment, weighing against admissibility. Although Slipper's testimony may be relevant to Marr's knowledge of the rounds, defendants argue that the Slipper evidence is more prejudicial than probative and therefore inadmissible under FRE 403. Defendants contend that the Slipper testimony would be improperly considered as propensity evidence, and point out that any evidence that Marr acknowledged that rounds were illegal is not probative because knowledge of illegality is irrelevant to a bid rigging conspiracy. Because defendants have demonstrated that the Slipper testimony would be unduly prejudicial, their objection to admitting the Slipper testimony as FRE 404(b) evidence is SUSTAINED.

**B.      Government's Motions in Limine**

**1.      Gov't MIL No. 1 to Adopt Prior Pretrial Rulings**

The government's first motion in limine encompasses five separate issues by asking the court to adopt its earlier rulings on the motions in limine filed by the government in related bid rigging cases *Florida I*, CR 14-582 PJH, and *U.S. v. Joyce*, CR 14-607 PJH:

i. precluding defendants from offering evidence or argument justifying the bid rigging agreements;

ii. admitting evidence of the plea agreements of cooperating witnesses subject to certain procedures adopted in *Joyce*:

(a) The truthfulness provisions of the plea agreements must remain redacted, unless the witness's credibility is attacked;

(b) The government's questioning during its case-in-chief is limited to the existence and terms of the guilty pleas and plea agreements, including

17

the factual basis of the plea, the fact that the cooperator has yet to be sentenced, and the hope of receiving a reduced sentence partly due to their testimony at trial;

(c) References to the potential sentence or potential maximum statutory sentence that the cooperator could receive must be redacted because it may signal to the jury the punishment that defendant is facing, though that is a prohibited consideration; however, the court may permit evidence of a mandatory minimum sentence that a witness faces in the absence of a motion by the government; and

(d) To minimize the risk of undue prejudice to defendant by introducing evidence of the cooperating witnesses' plea agreements, the court will give limiting instructions based on Ninth Circuit Model Criminal Jury Instruction 4.9 and the ABA model instructions for criminal antitrust cases.

iii. excluding evidence of citizen complaints against witnesses;

iv. excluding evidence regarding the disposition of nontestifying coconspirators; and

v. excluding evidence or argument impeaching Witnesses A (Bradley Roemer), B (Michael Renquist), C (Miguel De Sanz), and D (Joseph Vesce) by introduction of evidence of prior convictions that would not be admissible under FRE 609(a).

At this juncture, defendants do not oppose parts (ii) through (v) of the government's MIL No. 1, subject to reserving their right to object based on the evidence at trial. Doc. no. 230. Defendants oppose part (i) of the government's MIL No. 1 seeking to exclude evidence or argument on the reasonableness of defendants' conduct, asserting the same arguments raised in defendants' joint MIL No. 1 to admit the testimony of their consultant, Jeffrey S. Andrien, and in their joint brief in support of defendants' proposed instruction on "unreasonable restraint" as an element of the bid

18

rigging charge and their request to admit evidence whether their alleged agreement resulted in an unreasonable restraint of trade.  Doc. nos. 209, 212, 230.  As the court ruled in Pretrial Order No. 2 denying defendants' motion to apply the rule of reason to the bid rigging charge, bid rigging is widely recognized as a form of price-fixing, which is "conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *Northern Pac. Ry. Co. v. U.S.*, 356 U.S. 1, 5 (1958).  Doc. no. 135 at 2.  As discussed more fully above in denying defendants' joint MIL to admit Andrien's testimony, defendants' due process challenges to the per se rule are foreclosed by *Manufacturers' Ass'n*.  Because evidence of reasonableness or pro-competitive justification for bid rigging is not relevant, it is not admissible under FRE 402.

Similarly, evidence that the auctioneers, trustee companies or banks were negligent in preventing the anticompetitive conduct, or even acquiescent, is not relevant to bid rigging.  Defendants argue that the fact that trustee companies and beneficiaries showed total indifference to the agreements not to bid is circumstantial evidence that they did not regard defendants' conduct as harmful or illegal.  This evidence is not relevant to the bid rigging charge, and under FRE 403, any probative value of evidence of reasonableness or the negligence of other parties is substantially outweighed by the danger of unfair prejudice or confusion of the issues.

Defendants point out that in previous trials, the government argued that the defendants suppressed prices at the public auction and then pocketed what would have otherwise gone to the beneficiaries by conducting the secondary rounds.  Defendants assert they have a right to present a defense showing that their actions did not artificially suppress prices at the public auctions, as alleged in the Means and Methods section of the indictment, paragraphs 10.d and 25.d.  The government is not required to prove every allegation in the indictment, in light of authority recognizing that "[a]s long as the crime and the elements of the offense that sustain the conviction are fully and clearly set out in the indictment, the right to a grand jury is not normally violated by the fact that the

19

1    indictment alleges more crimes or other means of committing the same crime." *Miller*,

2    471 U.S. at 136. The government represents that it will not present statistical evidence

3    that prices were artificially suppressed, as it is not required to prove economic harm. *See*

4    doc. no. 236 at 11.

5         Because the government need not prove all the allegations of the indictment or

6    prove the anti-competitive effects of bid rigging, which is unreasonable per se, the

7    proposed argument or evidence that defendants' actions did not artificially suppress

8    prices at the public auctions would not be relevant to an element of the Sherman Act

9    count, and could create confusion as to whether that pro-competitive effect on prices

10   would justify the bid rigging agreement. Because bid rigging is plainly anticompetitive,

11   "[i]t is no excuse that the prices fixed are themselves reasonable." *Catalano, Inc. v.*

12   *Target Sales, Inc.*, 446 U.S. 643, 647 (1980) (horizontal agreement among wholesalers

13   to eliminate credit sales is per se illegal). "[W]hen a particular concerted activity entails

14   an obvious risk of anticompetitive impact with no apparent potentially redeeming value,

15   the fact that a practice may turn out to be harmless in a particular set of circumstances

16   will not prevent its being declared unlawful per se." *Id.* at 649.

17        Accordingly, the government's MIL No. 1 is GRANTED with respect to part

18   (i) precluding defendants from offering evidence or argument justifying the bid rigging

19   agreements, based on the court's earlier ruling in Pretrial Order No. 2 denying

20   defendants' motion to apply the rule of reason. The government's MIL No. 1 is

21   GRANTED as unopposed as to parts (ii) through (v), subject to defendants reserving their

22   right to object based on the evidence at trial.

23        It is further ORDERED that the government refrain from using the term "victims"

24   when referring to banks, beneficiaries, and trustees throughout the trial, to avoid

25   unnecessary confusion about harm or injury. If the government introduces evidence or

26   argument that the bid rigging agreement had the effect of artificially suppressing prices or

27   causing economic harm to the banks or beneficiaries, defendants may object and the

28   court will determine whether to give a curative instruction that economic harm is not an

issue that the jury will need to decide and that the jury will not be asked to find any

adverse impact of the charged conspiracy or any anticompetitive effect of the charged

conspiracy.

2.      **Gov't MIL No. 2 to Exclude Civil Lawsuits Involving Undercover**
        **FBI Agent UCE-3322**

The government's motion to exclude evidence of three lawsuits that involved UCE-3322 is GRANTED as unopposed, subject to defendants reserving their right to cross-examine if the evidence at trial provides a foundation for cross-examination under FRE 608(b).

The court adopts the protocol for the undercover agent ("UC") to testify under his pseudonym as ordered in *Florida I*, based on the court's findings of legitimate concerns for the UC's safety. *Florida I*, CR 14-582 PJH, doc. no. 282. As in *Florida I,* the jury will not be told that the UC is testifying pseudonymously, due to the risk of prejudice by creating the false appearance that the accused defendants are responsible for the witness being in danger of testifying under his real name:

> (1) The undercover agent's real name, as well as the pseudonym he will be testifying under, will be part of the list vetted with the jury venire to determine any potential conflicts.

> (2) Before the undercover witness testifies, he will be sworn in with his real name in a sealed hearing, outside the presence of the jury.

> (3) During the undercover agent's testimony in front of the jury, he will be referred to once by his pseudonym, and thereafter will only be referred to as "Agent." The jury will not be told that the undercover agent is testifying under a pseudonym, as that would risk prejudicing the defense for the reasons stated above.

*Florida I*, CR 14-582 PJH, doc. no. 292.

3.      **Gov't MIL No. 3 to Admit Business and Public Records**

In its MIL No. 3, the government seeks admission of self-authenticating

1  documents, which defendants have not yet stipulated are admissible because the

2  government did not provide copies of the marked exhibits until the date of the pretrial

3  conference.  At this time, defendants do not raise any specific objections to the

4  documents, but generally oppose their admissibility until they have reviewed the exhibits.

5  Based on the government's proffer and the court's familiarity with similar

6  documents that were introduced in related bid rigging trials, the court TENTATIVELY

7  GRANTS the government's MIL No. 3 to admit business records, public records, and

8  statements in documents that affect an interest in property pursuant to FRE 803(6), (8)

9  and (15), and self-authenticating documents pursuant to FRE 902(1), (4) and (11),

10  subject to defendants' reserved right to raise objections to specific documents at trial.

> **4.** **Gov't MIL No. 4 to Preclude Questioning about Alleged**
> **Government Inaction Relating to Forfeiting Cooperators'**
> **Licenses, Businesses, and Properties**

14  The government moves to exclude questions on cross-examination about the

15  government's inaction in forfeiting real estate licenses, businesses, and/or properties of

16  its cooperating witnesses, which defense counsel in *Florida II,* CR 14-582 JD, argued

17  was one of the benefits that cooperators received from the government.  The government

18  contends that it does not have power to forfeit property in this case, because the

19  Sherman Act only authorizes forfeiture of goods that are in transit.  Doc. no. 218 at 7-8

20  and n.4 (citing 15 U.S.C. § 6).

21  Defendants oppose the government's motion to exclude such questions because it

22  precludes the defense from exposing possible witness bias, in violation of defendants'

23  Sixth Amendment right to cross-examine witnesses, and the government has not

24  provided legal or factual support for its argument that it has no legal authority to take the

25  cooperators' licenses or property.  Doc. no. 230 at 3-5.  *See U.S. v. Sedaghaty,* 728 F.3d

26  885, 901-02 (9th Cir. 2013) ("'The exposure of a witness' motivation in testifying is a

27  proper and important function of the constitutionally protected right of cross-

28  examination.'") (quoting *Davis v. Alaska*, 415 U.S. 308, 316-17 (1974)).

With respect to real estate licenses, state law provides that a felony conviction may be a ground for denying or revoking a real estate license (Cal. Bus & Prof Code § 480 (denial), § 10177(b) (suspension, revocation, denial of real estate license)). Defendants point out that the government explicitly agreed in the plea agreements of cooperating witnesses that "it will advise the appropriate officials of any governmental agency considering such administrative action of the fact, manner, and extent of the cooperation of the defendant as a matter for that agency to consider before determining what administrative action, if any, to take," thereby assisting the witnesses in retaining their licenses. *See U.S. v. Vesce*, CR 13-415 PJH, Doc. No. 30 ¶ 19; *U.S. v. Bradley Roemer*, CR 15-229 PJH, Doc. No. 22 ¶ 19. The government concedes that defendants may cross-examine the witnesses on whether the government has intervened on their behalf before state agencies, including the California Bureau of Real Estate, but objects to any suggestion that the government has power to revoke licenses issued by state agencies.

With respect to questioning witnesses about whether they were permitted to keep ill-gotten property, defendants argue that the government compels cooperating defendants to return property "routinely" either as restitution or voluntary forfeiture. Defendants do not, however, contend that there is any statutory basis for the government to seek forfeiture, now that the mail fraud counts have been dismissed from the indictment.

Based on the representations of defense counsel as to the scope of cross-examination, the court will permit defendants to cross-examine the witnesses about the government's actions or inactions with respect to the witnesses' licenses, businesses or properties, subject to avoiding any suggestion that the government has authority to forfeit property or revoke state licenses. The government's MIL No. 4 is therefore DENIED.

### 5. Summary Charts

The government filed a notice of intent to introduce summary charts under FRE 611(a), only five days before the pretrial conference. Doc. no. 239. The government

seeks to admit the charts as well as the underlying documents under FRE 611(a) to aid the jury in examining evidence that has been admitted, citing authority recognizing such charts as "hybrids" where they are not admitted strictly under FRE 1006. The government fails to demonstrate how admitting the voluminous records in addition to the summary charts would assist the jury. Subject to reserving defendants' right to object after having an opportunity to review the foundation for the summary charts, the court tentatively orders that the summary charts may be admitted under FRE 1006, in lieu of admitting the voluminous records.

### III.    Coconspirator Statements

#### A.    Legal Standard

In order for a coconspirator statement to be admissible at trial under Federal Rule of Evidence 801(d)(2)(E), the prosecution must show by a preponderance of the evidence that:

(1) the conspiracy existed when the statement was made;

(2) the defendant had knowledge of, and participated in, the conspiracy; and

(3) the statement was made "in furtherance" of the conspiracy.

*United States v. Larson*, 460 F.3d 1200, 1212 (9th Cir. 2006), *adopted in relevant part on reh'g en banc*, 495 F.3d 1094, 1096 n.4 (9th Cir. 2007). However, the introduction of coconspirator statements is distinct from the issue of admissibility. That is in part because the court considers all of the evidence, even the defendants' evidence, in making the ultimate admissibility determination. *See* 30B MICHAEL H. GRAHAM, FEDERAL PRACTICE & PROCEDURE, EVIDENCE § 7025, at 303-04 (2011 interim ed.) ("[a]t the conclusion of the presentation of evidence, the trial court on motion must determine on all the evidence including evidence offered by the defendant whether the government has established the requisite foundation") (emphasis added).

It is within the court's discretion to determine the order of proof or the showing, if any, that is appropriate prior to the government's introduction of the coconspirator statements. *United States v. Arbelaez*, 719 F.2d 1453, 1460 (9th Cir. 1983) (concluding

1  that it was not an abuse of discretion for the court to allow the government to introduce

2  coconspirator statements prior to establishing prima facie the existence of a conspiracy).

3  Courts have utilized various approaches regarding the order of proof.  One such

4  approach has been the provisional or conditional admission of the statement subject to it

5  later being "connected up" at "the conclusion of the presentation of evidence," at which

6  time the court must determine whether the government has established the requisite

7  foundation (in this case, as set forth by the Ninth Circuit in *Larson*) to be more probably

8  true than not true.  *See* 30B GRAHAM, FEDERAL PRACTICE & PROCEDURE, EVIDENCE § 7025;

9  4 MUELLER & KIRKPATRICK, FEDERAL EVIDENCE § 8:62 (Procedure for Applying

10 Coconspirator Exception) (4th ed., updated May 2016); *Arbelaez*, 719 F.2d at 1460.

11        Another approach includes what has essentially been deemed a mini-trial or

12 James hearing in advance of trial at which the court may consider each proffered

13 coconspirator statement and determine whether the government has established the

14 required foundational requirements as to each statement.  *See* 30B GRAHAM, FEDERAL

15 PRACTICE & PROCEDURE, EVIDENCE § 7025 (citing *United States v. James,* 590 F.2d 575,

16 581-82 (5th Cir. 1979), *abrogated in part by Bourjaily v. United States*, 483 U.S. 171,

17 175-76 (1987) (establishing preponderance of the evidence standard)).  In a third

18 approach, which has been deemed the "middle course," the court requires the

19 government to make a preliminary showing or summary of its evidence establishing the

20 predicate facts, while deferring the final decision until the conclusion of the presentation

21 of the evidence.  *See* 4 MUELLER & KIRKPATRICK, FEDERAL EVIDENCE § 8:62; *see also*

22 *United States v. Cox*, 923 F.2d 519, 526 (7th Cir. 1991) (the "preferable procedure would

23 be to at least require the government to preview the evidence which it believes brings the

24 statements within the coconspirator rule before delving into the evidence at trial").

25        As the court has ruled in other cases, including *Florida I, Joyce, U.S. v. Coleman*,

26 CR 11-904 PJH, and *U.S. v. Zaragoza*, CR 08-83 PJH, this court adopts the "middle

27 course" on the government's requisite showing prior to introducing the coconspirator

28 statements.  In accordance with this approach, the court will preview prior to trial a

summary of the coconspirator statements to be offered by the government.  Following

this preview, the court will determine which statements the government will be permitted

to introduce, either through the testimony of a witness or by documentary evidence.

Even though the ultimate finding as to admissibility will not be made until after the trial

has commenced and perhaps as late as the close of the evidence, the witnesses will be

permitted to testify about coconspirator statements and documents containing such

statements will be published to the jury, subject to striking should the government not be

able to meet its burden as to all requirements for admissibility.  In this sense, the

government's introduction of the statements, which will have been previewed and

approved by the court, will result in their conditional admission.

The court may at some point during trial, and prior to the close of the evidence,

rule on whether the government has shown by a preponderance of the evidence two of

the three prongs required for the admissibility of all of the proffered coconspirator

statements, including that (1) the conspiracy existed when the statement was made; and

(2) that the defendant had knowledge of, and participated in, the conspiracy.  *Larson*, 460

F.3d at 1212.  The court, however, will not determine until after the witness testifies

and/or the documentary evidence containing the particular coconspirator statement is

introduced whether or not the government has shown by a preponderance of the

evidence that the statement was made "in furtherance" of the conspiracy.  *See id.*  As the

court ruled in *Coleman* and *Zaragoza*, a coconspirator statement will NOT be

unconditionally admitted into evidence until the court has determined that all three *Larson*

prongs have been satisfied as to that statement.

**B.      Sufficiency of Notice of Coconspirator Statements**

The court's protocol requires the government to disclose the following information

with a list of the coconspirator statements to be introduced at trial:

(1) the identity of the testifying witness and/or the source of the conspirator

statement;

(2) a statement describing the witness and/or the source of the conspirator

statement;

(3) a summary of the evidence showing that the proffering witness, if a coconspirator, knew about and participated in the conspiracy;

(4) the specific coconspirator statements to be introduced via that witness and/or the source of the conspirator statement;

(5) the identity of the declarant of each specific coconspirator statement; and

(6) a summary of the evidence showing that each declarant of the coconspirator statement(s) knew about and participated in the conspiracy.

*Zaragoza*, CR 08-83 PJH, doc. no. 576 (Amended Order for Pretrial Preparation). The government must also provide particulars of when the proffered statement was made, to establish that it was made during the relevant period. *Larson*, 460 F.3d at 1211 (requiring the government to establish that "the conspiracy existed when the statement was made"). This requirement may be satisfied by providing sufficient detail to determine whether the statements were made in the course of, and in furtherance of, the conspiracy, and does not require the government to identify the exact date and time that the statement was made. *See Coleman*, CR 11-904 PJH, doc. no. 97 (granting in part motion to clarify pretrial order) and 122 (clarifying pretrial order).

Following the court's protocol as set forth in *Zaragoz*a, the government provided notice of coconspirator statements to be offered at trial in the form of charts, with the understanding that the court will determine whether the statement was made "in furtherance" of the conspiracy under the third *Larson* prong, and rule on admissibility at trial. Doc. nos. 136 (initial notice of coconspirator statements), 194 (notice of withdrawal of certain coconspirator statements following dismissal of mail fraud counts), 195 (revised notice), 196 (supplemental notice).

### 1.    Summaries of Coconspirator Statements

The government prepared charts organizing the coconspirator statements by type of document or statement, and specifying the date of the alleged coconspirator statement, except as provided in witness testimony:

(A) round sheets which tracked the individuals participating in each round, how much they bid during the round, and where they dropped out in the round. Doc. no. 137, Appx. A and doc. no. 196, Suppl. Appx. A.

(B) payoff ledgers found in Community Fund's office, which listed the properties in which coconspirators participated in a round, and the amount of payoff owed each property. Doc. no. 137, Appx. B and doc. no. 196, Suppl. Appx. B.

(C) emails regarding payments owed for rounds. Doc. no. 196, Suppl. Appx. C.

(D) consensual audio-video recordings of coconspirator statements. Doc. no. 137, Appx. D and doc. no. 196, Suppl. Appx. D.

(E) other documents such as handwritten notes on the memo lines of payoff checks, "net sheets," where conspirators calculated the acquisition costs for a given property, and other conspirator notes relating to meetings and payoffs. Doc. no. 137, Appx. E and doc. no. 196, Suppl. Appx. E.

(F) anticipated testimony of witnesses about what coconspirators said to reach agreements to rig bids at public auctions, conduct rounds, determine and make payoffs, and conceal their conduct. The summary chart in Revised Appendix F, as supplemented, is taken from witness interview reports, which have not been reviewed or adopted by the witnesses, and are not verbatim transcripts. Doc. no. 195, Revised Appx. F and doc. no. 196, Suppl. Appx. F.

The court determines that the government has identified these statements with sufficient specificity by providing copies of certain categories of documents (i.e., (A) the round sheets, (B) payoff ledgers, (C) emails, (E) handwritten notes and other documents),. With respect to (D) audio-video recordings containing the coconspirator statements, the government has provided transcripts of the excerpts to give sufficient notice of those statements. With respect to (F) anticipated witness testimony, the government has

provided highlighted copies of 302 interview reports, which provides sufficient specificity about what the statement is and when it was made.

With respect to statements disclosed in the government's second supplemental notice filed April 14, 2017, doc. no. 238, the notice is untimely and the statements identified therein will not be admitted as coconspirator statements under FRE 801(d)(2)(E).  If the government seeks to admit those statements on other grounds, it must first proffer the basis for admissibility before introducing the statements at trial.

### 2. Non-testifying Coconspirators

Defendants object to the admissibility of alleged coconspirator statements made by cooperating witnesses who will not be called to testify, on the ground that admitting those statements would violate their Sixth Amendment right of confrontation.  Doc. no. 206 at 3.  The government's notice refers to witness statements of the following coconspirators who have not been named as witnesses: Thomas Franciose (Suppl. Appx. F); John Shiells (Revised Appx. F); and Hilton Wong (Suppl. Appx. F).  As to those particular coconspirator statements, defendants' objection is SUSTAINED.  If the government intends to offer these coconspirator statements, it must first establish (1) the declarant's unavailability and (2) the reliability of those statements.  *United States v. Tille*, 729 F.2d 615, 621 (9th Cir. 1984) ("[s]atisfaction of the requirements for admission as a coconspirator statement does not eliminate confrontation clause questions").

### 3. Existence of Single Conspiracy

Defendants object to the notice of coconspirator statements on the ground that there were dozens, if not hundreds, of separate and distinct conspiracies and that the government has failed to show that there was a single conspiracy, as charged in the indictment.  Defendants contend that the government has not shown that there was a single conspiracy, rather than multiple conspiracies, as a foundation to establish the *Larson* factors: (1) the single conspiracy existed when the statement was made; (2) each defendant had knowledge of, and participated in, the conspiracy, and the declarant and each defendant was a member of that same conspiracy when the statement was made;

and (3) the statement was made "in furtherance" of that specific conspiracy.  Doc. no.

206 (incorporating by reference defendants' previously filed Motion in Limine No. 2, doc.

no. 148 at 5-6).

The Ninth Circuit recognizes a "single agreement" test for a single conspiracy:

"The general test is whether there was 'one overall agreement' to perform various

functions to achieve the objectives of the conspiracy.  Performance of separate crimes or

separate acts in furtherance of a conspiracy is not inconsistent with a 'single overall

agreement.'"  *United States v. Zemek*, 634 F.2d 1159, 1167 (9th Cir. 1980) (citations

omitted).  "The general test also comprehends the existence of subgroups or

subagreements."  *Id.*  To distinguish a single conspiracy from multiple conspiracies, the

Ninth Circuit considers several factors:

> To establish the existence of a single conspiracy, as compared to multiple conspiracies, the basic "test is whether there was 'one overall agreement' to perform various functions to achieve the objectives of the conspiracy."  *United States v. Zemek*, 634 F.2d 1159, 1167 (9th Cir. 1980), *cert. denied*, 452 U.S. 905 and 450 U.S. 916, 985 (1981).  Moreover, the "general test also comprehends the existence of subgroups or subagreements."  *Zemek*, 634 F.2d at 1167.  We have also said that "[t]he evidence need not be such that it excludes every hypothesis but that of a single conspiracy; rather it is enough that the evidence adequately support a finding that a single conspiracy exists."  *United States v. Kenny*, 645 F.2d 1323, 1335 (9th Cir.), *cert. denied*, 452 U.S. 920 (1981), cited in *United States v. Mastelotto*, 717 F.2d 1238, 1246 (9th Cir. 1983) [*overruled on other grounds by Miller*, 471 U.S. at 135–36].
> . . .
> To determine whether the evidence supports the existence of one overall criminal venture, relevant areas of inquiry include "the nature of the scheme; the identity of the participants; the quality, frequency, and duration of each conspirator's transactions; and the commonality of times and goals."  *Zemek*, 634 F.2d at 1168; *see, e.g., United States v. Baxter*, 492 F.2d 150, 158 (9th Cir. 1973), *cert. denied*, 416 U.S. 940 (1974) (jury may find one overall scheme if each defendant "knew or had reason to know, that other retailers were involved ... in a broad project for the smuggling, distribution and retail sale of narcotics, and had reason to believe that their own benefits derived from the operation were probably dependent upon the success of the entire venture ....").

*United States v. Arbelaez*, 719 F.2d 1453, 1457–58 (9th Cir. 1983) (affirming convictions

for conspiracy to possess cocaine with intent to distribute and related offenses, finding

United States District Court
Northern District of California

1    there was substantial evidence from which a rational juror could have concluded that

2    appellants engaged in a single overall conspiracy).

3         Defendants do not address the specific *Arbelaez* factors to determine the

4    existence of a single overall conspiracy, but argue generally that the indictment is vague

5    on the details of the conspiracy, and that the discovery relating to hundreds of properties

6    does not clarify the scope of the conspiracy.  The court determines that the government's

7    brief in support of the notice establishes, by a preponderance of the evidence, the

8    existence of a single conspiracy among competitors not to bid against each other at

9    public auction in Alameda County and a single bid rigging conspiracy in Contra Costa

10   County, each involving 4 primary steps: (a) refraining from bidding against each other for

11   certain properties at the public auction; (b) negotiating payoffs at the secondary auctions,

12   also known as round robins or rounds; (c) completing auction paperwork so that the

13   round winner, and not the public auction winner, actually provided funds for the purchase,

14   and submitting a Receipt of Funds completed by the round winner; and (d) making and

15   receiving round payoffs, either by cash or check.  Doc. no. 136 at 4-8 and 302 witness

16   interview summaries attached to Loeb Decl., Exs. A - AP.  Applying the *Arbelaez* test, the

17   government has sufficiently established a single conspiracy by a preponderance of the

18   evidence:

19           i. Nature of the Scheme: As described by the government, the nature of the

20        conspiracy was not limited to refraining from bidding only on certain properties, but

21        was an ongoing agreement not to bid on properties sold at Alameda or Contra

22        Costa County foreclosure auctions, without determining at the outset of the

23        conspiracy which properties would be subject to the secondary rounds, since the

24        properties changed day to day.

25           ii. Identity of Participants: As stated in the government's notice, 37

26        individuals have now admitted to participating in the Alameda or Contra Costa

27        County bid rigging conspiracy alleged against defendants.  Many of the

28        coconspirators participated with each other in many rounds, indicating an ongoing

agreement to refrain from bidding at the public auction and participating in the secondary rounds. The number of participants establishes the wide reach of the conspiracy, but does not necessarily weigh in favor of finding a single or multiple conspiracies.

iii. Quality, Frequency, Duration of Each Conspirator's Transactions: In applying this factor, courts usually look to how "heavily involved in the criminal enterprise" each participant was. *See Arbelaez*, 719 F.2d at 1458 ("Arcila and Garrido supplied cocaine whenever they could, in amounts as large as they had on hand, so long as they believed Beron could distribute the drugs."); *Zemek*, 634 F.2d at 1168 ("The evidence revealed a continuing relationship among participants organized in a hierarchical pattern."). Here, each defendant participated in multiple transactions by personally attending, or directing employees to attend, public foreclosure auctions and rounds, which does not suggest separate conspiracies given the continuity of the conduct over a two and a half-year period. As the government states in its notice:

- Michael Marr's real estate investment company, Community Fund, LLC, was implicated in 1,369 of the rigged properties in Alameda and Contra Costa County. Based on numerous cooperating witnesses' statements, Michael Marr directed employees to participate in rounds, kept meticulous accounting records, and collected or paid out money with Community Fund checks. Doc. no. 136 at 9.

- Gregory Casorso purchased properties at Alameda County auctions on behalf of Community Fund, organized and participated in rounds, and authored round sheets. Doc. no. 136 at 10. During an interview with the FBI, Casorso identified his coconspirators and told the FBI that he was the leader for Marr in Alameda County.

- Victor Marr participated in rounds at the direction of Michael Marr and Casorso in Alameda County, according to cooperating witnesses. Doc.

no. 136 at 10-11.

•     Javier Sanchez organized and participated in rounds in both Alameda and Contra Costa counties on behalf of Community Fund, and was tasked by Michael Marr to keep track of round monies owed among the conspirators, according to cooperating witnesses. Doc. no. 136 at 11.

iv. Commonality of Times and Goals: the government identifies the conspirators' shared objective, as stated in plea agreements: "The primary purpose of this conspiracy was to suppress and restrain competition to purchase the Alameda County selected properties at non-competitive prices." Doc. no. 136 at 8 (citing John Shiells's plea agreement). *United States v. Krasovich*, 819 F.2d 253, 255 (9th Cir. 1987) ("[n]ot only must the government prove knowledge of the illegal objective, it must also prove an agreement with a coconspirator to pursue that objective as a common one").

Defendants' objection to the coconspirator statements on the ground that the government cannot prove the existence of a single conspiracy is OVERRULED. Based on the proffered evidence and argument by the government, a rational juror could conclude that defendants "engaged in a single overall conspiracy," *see Arbelaez*, 719 F.2d at 1458, to show under the first *Larson* prong that a single conspiracy existed.

### 4. Knowledge of Conspiracy

The government has also sufficiently demonstrated that defendants knew of, and participated in, the conspiracy, given the evidence of their participation at the public auctions and the rounds with other coconspirators. As the court ruled in *Zaragoza*:

> A person may be a member of a conspiracy even though the person does not know all of the purposes of or participants in the conspiracy. *United States v. Escalante*, 637 F.2d 1197, 1200 (9th Cir. 1980); *United States v. Kearney*, 560 F.2d 1358, 1362 (9th Cir. 1977). To prove a single conspiracy the evidence must show that each defendant knew, or had reason to know, that other retailers were involved and that his benefits were "probably" dependent on the success of the entire operation. *United States v. Arbelaez*, 719 F.2d 1453, 1458 (9th Cir. 1983) (citing *United States v. Baxter*, 492 F.2d 150, 158 (9th Cir. 1973)). The government does "not need to

> show direct contact or explicit agreement between the defendants." *Id.* (quoting *United States v. Kostoff*, 585 F.2d 378, 380 (9th Cir. 1978)). Actual knowledge or awareness of "the identity, number or location of the other participating retailers" is not required. *Baxter*, 492 F.2d at 158; see also *United States v. Smith*, 609 F.2d 1294, 1298-1300 (9th Cir. 1979). Only a slight connection to a conspiracy is sufficient to convict a defendant of knowing participation in it. *Arbelaez*, 719 F.2d at 1458.

*Zaragoza,* CR 08-83 PJH, doc. no. 689 at 10. The evidence proffered by the government establishes by a preponderance that defendants had knowledge of, and participated in, the conspiracies to satisfy the second *Larson* prong.

Accordingly, the court finds that the government has made a sufficient preliminary showing of the first two *Larson* factors for admissibility of the documents in Appendices A through F to the notices of conspirator statements: (1) the conspiracy existed when the statement was made; and (2) each defendant had knowledge of, and participated in, the conspiracy. The coconspirator statements are conditionally admitted, subject to a determination whether the statements were made "in furtherance" of the conspiracy under the third *Larson* prong, and a final ruling on admissibility at trial.

## IV. Jury Instructions

### A. Undisputed Instructions

The parties separately proposed jury instructions. Doc. nos. 210, 223. Victor Marr submitted an individually proposed instruction on conspiracy. Doc. no. 214. The following jury instructions, which are based on Ninth Circuit Model Criminal Jury Instructions and ABA SECTION OF ANTITRUST LAW, MODEL JURY INSTRUCTIONS IN CRIMINAL ANTITRUST CASES (2009), are not disputed:

Gov't No. 1. Duty of Jury (9th Cir. Crim. Jury Instr. 1.1)

Gov't No. 3. What is Evidence (9th Cir. Crim. Jury Instr. 1.3)

Gov't No. 4. What is Not Evidence (9th Cir. Crim. Jury Instr. 1.4)

Gov't No. 5. Direct and Circumstantial Evidence (9th Cir. Crim. Jury Instr. 1.5)

Gov't No. 6. Ruling on Objections (9th Cir. Crim. Jury Instr. 1.6)

Gov't No. 7. Credibility of Witnesses (9th Cir. Crim. Jury Instr. 1.7)

1      Gov't No. 8. Conduct of the Jury (9th Cir. Crim. Jury Instr. 1.8)

2      Gov't No. 9. No Transcript Available to Jury (9th Cir. Crim. Jury Instr. 1.9)

3      Gov't No. 10. Taking Notes (9th Cir. Crim. Jury Instr. 1.10)

4      Gov't No. 11. Outline of Trial (9th Cir. Crim. Jury Instr. 1.11)

5      Gov't No. 12. Separate Consideration for Each Defendant (9th Cir. Crim. Jury

6          Instr. 1.13)

7      Gov't No. 13. Cautionary Instruction – First Recess (9th Cir. Crim. Jury Instr. 2.1)

8      Gov't No. 14. Bench Conferences and Recesses (9th Cir. Crim. Jury Instr. 2.2)

9      Gov't No. 15. Transcript of Recording in English (9th Cir. Crim. Jury Instr. 2.7)

10      Gov't No. 16. Evidence for Limited Purpose (9th Cir. Crim. Jury Instr. 2.11)

11      Gov't No. 17 and Defs' No. 1. Duties of Jury to Find Facts and Follow Law (9th Cir.

12          Crim. Jury Instr. 3.1)

13      Gov't No. 26. Statute of Limitations (ABA Crim. Antitrust Instr. at 89)

14      Gov't No. 27. Venue (ABA Crim. Antitrust Instr. at 85)

15      Gov't No. 28 and Defs' No. 2. Charge Against Defendant Not Evidence -

16          Presumption of Innocence - Burden of Proof (9th Cir. Crim. Jury Instr. 3.2)

17      Gov't No. 29 and Defs' No. 3. Defendant's Decision Not to Testify (9th Cir. Crim.

18          Jury Instr. 3.3)

19      Gov't No. 30. Defendant's Decision to Testify (9th Cir. Crim. Jury Instr. 3.4)

20      Gov't No. 31 and Defs' No. 7. Reasonable Doubt – Defined (9th Cir. Crim. Jury

21          Instr. 3.5)

22      Gov't No. 32 and Defs' No. 8. What is Evidence (9th Cir. Crim. Jury Instr. 3.6)

23      Gov't No. 33 and Defs' No. 9. What is Not Evidence (9th Cir. Crim. Jury Instr. 3.7)

24      Gov't No. 34 and Defs' No. 10. Direct and Circumstantial Evidence (9th Cir. Crim.

25          Jury Instr. 3.8)

26      Defs' No. 4. Activities Not Charged (9th Cir. Crim. Jury Instr. 3.10)

27      Gov't No. 37. "On or About" Defined (9th Cir. Crim. Jury Instr. 3.20)

28

Gov't No. 38. Statements by Defendants (9th Cir. Crim. Jury Instr. 4.1; *Bruton v. United States*, 391 U.S. 123 (1968))

Gov't No. 39 and Defs' No. 12. Testimony of Witnesses Involving Special Circumstances – Immunity, Benefits, Accomplice, Plea (9th Cir. Crim. Jury Instr. 4.9)

Gov't No. 40. Plea Agreements (ABA Crim. Antitrust Instr. at 118)

Gov't No. 41. Disposition of Charges Against Coconspirators (ABA Crim. Antitrust Instr. at 105)

Gov't No. 42 and Defs' No. 15. Charts and Summaries in Evidence (9th Cir. Crim. Jury Instr. 4.16)

Gov't No. 43 and Defs' No. 14. Charts and Summaries Not Received in Evidence (9th Cir. Crim. Jury Instr. 4.15)

Gov't No. 47. Jury Consideration of Punishment (9th Cir. Crim. Jury Instr. 7.4).

With respect to the following model instructions, defendants propose alternative versions that alter or omit text from the model instructions without providing authority to substantiate the modifications. Doc. no. 210 (Defs' Nos. 11, 25-29). In the absence of authority to support defendants' modifications, the court rejects defendants' proposed instructions 11 and 25 through 29, and ADOPTS the following model instructions without modification as proposed by the government:

Gov't No. 35. Credibility of Witnesses (9th Cir. Crim. Jury Instr. 3.9)

Gov't No. 44. Duty to Deliberate (9th Cir. Crim. Jury Instr. 7.1)

Gov't No. 45. Consideration of Evidence – Conduct of the Jury (9th Cir. Crim. Jury Instr. 7.2)

Gov't No. 46. Use of Notes (9th Cir. Crim. Jury Instr. 7.3)

Gov't No. 48. Verdict Forms (9th Cir. Crim. Jury Instr. 7.5)

Gov't No. 49. Communication with Court (9th Cir. Crim. Jury Instr. 7.6)

Doc. no. 223.

**B. Disputed Instructions**

**1. Instructions Applying Per Se Rule**

Defendants object to the following instructions proposed by the government, which were given in *Florida I, Joyce,* and *Guillory,* on the ground that they fail to include the element of an "unreasonable restraint" on trade:

Gov't No. 2: The Charge (9th Cir. Crim. Jury Instr. 1.2 and ABA Crim. Antitrust Instr. at 27; listing elements of bid rigging)

Gov't No. 18: Per Se Violations (ABA Crim. Antitrust Instr. at 54)

Gov't No. 19: Elements of the Bid Rigging Offenses (ABA Crim. Antitrust Instr. at 47)

Doc. no. 231. Defendants propose alternative instructions applying the rule of reason, to instruct the jury on "unreasonable restraint" of trade:

Defs' No. 17: Elements of the Bid Rigging Offense

Defs' No. 24: Theory of the Case - Rule of Reason

In their proposed instruction No. 17, defendants propose adding an element requiring "unreasonable restraint of trade" to the Elements of Bid Rigging, and adding language from the indictment, requiring the government to prove that a conspiracy existed "to suppress and restrain competition by rigging bids to obtain hundreds of selected properties offered at public auctions." Doc. no. 210 (Defs' No. 17). Defendants also propose a rule of reason instruction, Defs' No. 24, based on a model ABA instruction for civil antitrust cases applying the rule of reason.

As previously discussed, bid rigging is per se unreasonable within the meaning of the Sherman Act under clearly established federal law, and under controlling Ninth Circuit authority, "[t]he per se rule does not operate to deny a jury decision as to an element of the crime charged." *Manufacturers' Ass'n*, 462 F.2d at 52. Furthermore, because the government is not required to prove all the allegations of the indictment, only the elements of the offense must be given in the instruction, as proposed by the government's proposed instruction No. 19, which is based on the model ABA instruction

on elements of the offense. The government's proposed instruction on "Elements of the Offense" does not alter the bid rigging crime charged in the indictment so as to result in a constructive amendment, as argued by the defense. *See United States v. Davis*, --- F.3d ---, 2017 WL 1363804, *1 (9th Cir. Apr. 14, 2017) ("'A constructive amendment occurs when the charging terms of the indictment are altered, either literally or in effect, by the prosecutor or a court after the grand jury has last passed upon them.'") (quoting *United States v. Ward*, 747 F.3d 1184, 1190 (9th Cir. 2014)).

To the extent that the "knowingly" element of the model ABA instruction does not require "intending to help achieve" the anticompetitive objectives of the conspiracy to rig bids, as proposed by defendants' No. 17, such a finding of intent to produce anticompetitive effects is not required for a per se violation of the Sherman Act. *United States v. Brown*, 936 F.2d 1042, 1046 (9th Cir. 1991) ("a finding of intent to conspire to commit the offense is sufficient; a requirement that intent go further and envision actual anti-competitive results would reopen the very questions of reasonableness which the per se rule is designed to avoid.") (citations and internal marks omitted). Thus, defendants' objections to the government's proposed instructions Nos. 2 (The Charge), 18 (per se violations) and 19 (elements) applying the per se rule are OVERRULED.

Accordingly, the court adopts the government's proposed instructions Nos. 2, 18 and 19, and DENIES defendants' request to give Defs' Nos. 17 (elements) and 24 (rule of reason).

### 2. Bid Rigging

Defendants object to the government's proposed Instruction No. 20 (Bid Rigging), which was given in *Florida I, Joyce* and *Guillory,* on the ground that it relies on the per se rule. Defendants also generally object on the grounds that this instruction is confusing, internally inconsistent, mischaracterizes the law, and essentially directs a verdict of guilty, without explaining or citing specific language to support the objection. Doc. no. 231. Defendants propose an alternate instruction No. 18 entitled "Sherman Act Violations"

which is loosely based on the same model ABA Bid Rigging instruction cited by the government.  ABA Crim. Antitrust Instr. at 54-56, 61-63.

Defendants' proposed instruction (1) takes out introductory language explaining that conspiracy to rig bids is the first element of the offense, and (2) adds language to the ABA model instruction related to a joint venture or partnership.  In support of their proposed version, defendants cite the instructions given in *U.S. v. Katakis,* CR 11-511 (E.D. Cal. 2014) which is factually distinguishable from this case and not binding here.

The court does not adopt defendants' proposed instruction No. 18 for two reasons. First, omitting the introductory language about conspiracy omits important context for the jury, particularly because the court will not give a separate conspiracy instruction where defendants are not charged with a separate conspiracy count apart from the bid rigging count, and the elements of a bid rigging conspiracy are covered by the ABA model instruction on elements of the offense.  Second, the proposed instructions about finding a joint venture or partnership could cause unnecessary confusion and mislead the jury.  As the government points out in its objections, the government will try to prove an agreement between horizontal competitors, and there will be no evidence that the charged conduct was the product of a joint venture or partnership.  Doc. no. 333 at 8.  The government squarely addressed this argument in opposition to defendants' motion to adjudicate pursuant to the rule of reason, and defendants have not shown, even at this juncture, that there would be evidence of a joint venture in this case.  Doc. no. 95 at 4 ("Joint bidding is a specific type of joint venture.  It exists when two or more firms decide to submit a joint bid on a project, agreeing to share in the development, profits, and losses of the project, because each alone would not be willing to submit the bid.") (citing P. AREEDA & H. HOVENKAMP, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION ¶ 2005 (updated Aug. 2015); *Kearney v. Taylor*, 56 U.S. 494 (1853) (competition to purchase land was strengthened by the joint venture because it allowed individuals to pool their resources in order to submit a bid)).

The government's proposed modifications to the model ABA Bid Rigging instruction, as given in related bid rigging trials, are better tailored to the evidence in this case: referring to "properties sold at the auctions" rather than "products [services]"; omitting bracketed instructions that are not relevant; and specifying that this instruction goes to the first element of the antitrust crime. The government also proposes including an instruction that a single conspiracy "may involve several subagreements or subgroups of conspirators," which the court approved in *Florida I* as part of a separate conspiracy instruction, and in *Joyce* and *Guillory.* The government does not propose the bracketed paragraphs of the model ABA instruction that defendants partially propose in their version of the Bid Rigging instruction. The court notes that the Bid Rigging instruction was given in *Florida I, Joyce* and *Guillory* with the bracketed paragraphs 4 through 7 of the model ABA Criminal Antitrust Instruction, at 61-62.

The court further notes that defendants did not request a single entity instruction, as given in *Florida* and *Guillory*: "An internal agreement only between owners and employees of the same company does not constitute a conspiracy." *Florida I*, doc. no. 318 (order re: request for single entity instruction). *See Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1147 (9th Cir. 2003) (holding that the single-entity rule applies to a company and its officers, employees and wholly owned subsidiaries; firms owned by the same person; and principal-agent relationships) (citing *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 771 (1984)). A single entity instruction here may address defendants' concern that the government's proposed instruction fails to define who is a competitor and fails to distinguish defendants who work together.

To ensure that the instruction is tailored to the evidence in this case, the court ORDERS the parties to meet and confer on the applicability of the bracketed paragraphs of the ABA model Bid Rigging instruction, indicated in the government's proposed instruction No. 20, and a single entity instruction.

### 3. Rounds and Exchange of Information

Defendants propose substantive instructions that are not based on model jury

instructions but are specific to the evidence to be presented in this case: Defs' No. 19 - Participation in Rounds and Defs' No. 20 - Exchange of Bid Information.  Doc. no. 210.

(a)     Defs' No. 19: Defendants propose an instruction that participation in the rounds was not illegal in and of itself, in anticipation of the government's argument that the rounds were illegal and in support of their defense that the government must prove an agreement not to bid at public auctions and that participating in rounds is not, by itself, illegal.  The government responds that the rounds were overt acts in furtherance of the conspiracy, so that every round that was conducted pursuant to a bid rigging agreement was illegal.  Doc. no. 233 at 8-9 (citing *Hyde v. United States*, 225 U.S. 347, 360 (1912), *superseded on other grounds as recognized in Pena-Rodriguez v. Colorado*, 137 S. Ct. 855, 864 (2017), and *U.S. v. Monroe*, 552 F.2d 860, 864 (9th Cir. 1977) ("overt act need not be unlawful" and "to avoid complicity in the conspiracy, one must withdraw before any overt act is taken in furtherance of the agreement")).  The court notes that proof of an overt act is not a required element under the Sherman Act, and defendants' proposed instruction on elements of the bid rigging offense, Defs' No. 17, did not require proof of an overt act.  *See U.S. v. H. David Miller, et al.*, 771 F.2d 1219, 1226 (9th Cir. 1985) ("Because the Sherman Act punishes the mere act of conspiring, overt acts in furtherance of the conspiracy need not be alleged.") (citing *Socony-Vacuum*, 310 U.S. at 224-25 n. 59; *Nash v. United States*, 229 U.S. 373, 378 (1913)).

If the government will argue that participation in the secondary rounds was illegal as part of the alleged conspiracy, the court would be inclined to give an instruction to clarify that the rounds were not illegal activities in and of themselves, but are alleged to have been conducted in furtherance of the bid rigging conspiracy, and clarifying that defendants are not charged with a separate crime for participating in the rounds.  The parties are ORDERED to meet and confer on an instruction addressing defendants' participation in the rounds.

Defendants also propose instructing the jury that prospective bidders may hire agents to bid on their behalf, and that auctioneers are not required by law to verify funds

1   prior to an auction, but any such references to the roles of agents or auctioneers are not

2   relevant to any element of the crime.  This instruction does not address any factual issue

3   that the jury needs to find on a bid rigging count, now that the mail fraud counts have

4   been dismissed.  In support of this proposed instruction, defendants cite the instructions

5   given in *Katakis,* where, unlike here, the defendants were on trial for conspiring to commit

6   mail fraud.  Here, the mail fraud counts that were originally charged in the indictment,

7   which alleged fraudulent intent, have been dismissed.  Defendants' request to instruct on

8   the role of agents or auctioneers in the rounds is DENIED.

9           (b)     Defs' No. 20: Defendants propose an instruction that exchanging

10  information among competitors can increase economic efficiency and render markets

11  more competitive, and does not prove a conspiracy.  This proposed instruction addresses

12  whether there was an unreasonable restraint of trade, which is not at issue in this per se

13  bid rigging case.  Defendants cite authorities recognizing that parallel business practices

14  do not, alone, constitute Sherman Act violations, and that exchanges of information are

15  evaluated under a rule of reason analysis and are not considered a per se violation

16  because "such practices can in certain circumstances increase economic efficiency and

17  render markets more, rather than less, competitive."  *Gypsum*, 438 U.S. at 441 n. 16; *In*

18  *re Baby Food Antitrust Litig.*, 166 F.3d 112, 117 (3d Cir. 1999).  Those authorities are not

19  controlling here, where the government does not focus on allegations that defendants

20  exchanged information to establish a bid rigging agreement.  It is worth noting that the

21  Criminal Practice and Procedure Committee of the ABA's Antitrust Section determined

22  that a model instruction on price fixing by exchange of information was not warranted

23  given the unlikelihood that the government would bring a criminal price fixing or bid

24  rigging case where the focus of the conduct was exchanging information.  ABA, MODEL

25  JURY INSTRUCTIONS IN CRIMINAL ANTITRUST CASES at 67-68.  The ABA committee

26  suggested that such an instruction may be considered where the exchange of information

27  was integral to the business of the conspirators and the defense claims that the purpose

28  of the exchange was legitimate or procompetitive.  *Id.*  Without evidence that exchanging

42

1   information with competitors was integral to defendants' business, or allegations that

2   exchanging information was the focus of the bid rigging agreement, defendants'

3   proposed No. 20 would unnecessarily cause confusion.

4       Defendants' proposed instruction that exchanging information can increase

5   economic efficiency in a per se case is not supported by a model instruction or controlling

6   legal authority applying such an instruction. Based on the government's proffered

7   evidence of an agreement to rig bids, defendants have not shown any risk that they

8   would be found guilty only on the basis of exchanging information. Accordingly,

9   defendants' request to give their proposed instruction No. 20 is DENIED. As the

10  government points out, the ABA model Bid Rigging instruction, Gov't No. 20, sufficiently

11  instructs that helping or discussing common interests with competitors is not enough to

12  prove a conspiracy, but to address defendants' request for some specific instruction on

13  exchanging information, the court ORDERS the parties to meet and confer on the

14  following modification to the bid rigging instruction proposed as Gov't No. 20 ¶ 3, which is

15  taken from Ninth Circuit model instruction 8.20:

16          *For a conspiracy to have existed, it is not necessary that the*

17          *conspirators made a formal agreement or that they agreed on every*

18          *detail of the conspiracy. It is not enough, however, that they simply*

19          *met, discussed matters of common interest, acted in similar ways,*

20          **exchanged information,** *or perhaps helped one another. You*

21          *must find that there was a plan to commit at least one of the crimes*

22          *alleged in the indictment as an object of the conspiracy with all of*

23          *you agreeing as to the particular crime which the conspirators*

24          *agreed to commit.*

25  Doc. no. 223.

26          **4.      Multiple Conspiracies**

27      Defendants object to the government's proposed Instruction No. 22 on multiple

28  conspiracies, which is based on the Ninth Circuit Model Criminal Jury Instruction 8.22

and which was given in *Florida I, Guillory* and *Joyce,* and propose their own modified instruction on multiple conspiracies, Defs' No. 21. The commentary to Model Instruction 8.22 indicates it is to be used "when the indictment charges a single conspiracy and the evidence indicates two or more possible conspiracies." Although the government objects to giving the model instruction unless the evidence at trial supports the defense theory of multiple conspiracies, the court determines that the instruction is warranted here given the possibility that a reasonable juror may find that there was not a single overarching conspiracy and may agree with defendants that there were multiple conspiracies.

Defendants' modified version of this model instruction, Defs' No. 21, sets out their defense theory that the evidence shows there were multiple conspiracies, not a single, overall conspiracy to rig bids. Defendants' modifications to the Multiple Conspiracies model instruction unnecessarily summarize the defense's "theory of the case." Defendants also propose adding "continuing" to refer to "the single **continuing** conspiracy" without defining what "**continuing**" means. As the comment to Ninth Circuit model instruction 8.22 states, the model instruction "obviates the need for further instructions on multiple conspiracies," and the model instruction, without modification, "is adequate to cover a multiple conspiracy defense." The court DENIES defendants' request to give their proposed instruction No. 21 on the grounds that it is argumentative and unnecessarily confusing, and ADOPTS the model instruction on Multiple Conspiracies as proposed in the government's instruction No. 22.

### 5. Knowingly

The government proposes instruction No. 25 defining "Knowingly," based on Ninth Circuit model instruction 5.6. The government objects to defendants' proposed "Knowingly" instruction No. 22, which is based in part on model instruction 5.6, but inserts additional language which reiterates the second element of the Elements of Bid Rigging instruction. The modifications proposed in Defs' No. 22 are redundant in light of the government's proposed instruction No. 21, which is based on model instruction 8.23 on Conspiracy - Knowledge of and Association With Other Conspirators. Defendants did not

1  object to the government's proposed Instruction No. 21, as given in *Joyce* and *Guillory,*

2  which modifies the standard model instruction 8.23 on knowledge of a conspiracy by

3  removing the factors required to prove that defendants agreed to participate in the

4  conspiracy.

5       Defendants' proposed instruction No. 22 requires the government to prove "the

6  intent to aid or advance the purpose of the conspiracy."  Adding defendants' proposed

7  language may cause unnecessary confusion because the anticompetitive effects of the

8  bid rigging conduct are not relevant in a per se case, and because the bid rigging count

9  does not require that the defendant knew that the bid rigging was unlawful.  "'Where per

10  se conduct is found, a finding of intent to conspire to commit the offense is sufficient; a

11  requirement that intent go further and envision actual anti-competitive results would

12  reopen the very questions of reasonableness which the per se rule is designed to avoid.'"

13  *Brown*, 936 F.2d at 1046 (quoting *United States v. Koppers Co.,* 652 F.2d 290, 296 n. 6

14  (2d Cir. 1981)).  *See Koppers*, 652 F.2d at 298 ("even after *Gypsum* the intent element of

15  a criminal antitrust violation does not include any finding of malice; nothing more is

16  required than a showing that the defendant intentionally engaged in conduct that is a per

17  se violation of the Sherman Act").

18       Defendants' request to adopt their proposed instruction No. 22 is DENIED in favor

19  of adopting the government's proposed instructions No. 25, which is based on the same

20  model instruction, and No. 21, without the government's proposed modification to model

21  instruction to 8.23.  To address defendants' request to include a more specific instruction

22  on intent to commit the offense, the court will adopt the full text of Ninth Circuit model

23  instruction 8.23 which requires a finding that "the defendant directly conspired with one or

24  more conspirators to carry out at least one of the objects of the conspiracy."

25          **6.**    **Interstate Commerce**

26       Defendants propose a modified version of the ABA model instruction on Interstate

27  Commerce, including model language about whether the conspiracy "affected" interstate

28  commerce in goods and services, which is unnecessary and irrelevant in light of the

45

government's concession that it will only proceed on the theory that the conspiracy "occurred within the flow of" interstate commerce. Defs' No. 23 (citing ABA, MODEL JURY INSTRUCTIONS IN CRIMINAL ANTITRUST CASES at 82-83). The government's proposed instruction No. 24, which was given in *Florida I, Joyce* and *Guillory*, is based on the same ABA model instruction and on *United States v. Guthrie*, 814 F. Supp. 942, 944 (E.D. Wash. 1993), *aff'd*, 17 F.3d 397 (9th Cir. 1994) (unpublished) (affirming conviction after the district court denied a motion for new trial based on the defendant's objections to the instruction on interstate commerce).

Defendants' due process objection to the government's proposed interstate commerce instruction No. 24, stating that "the government's proof need not quantify or value any adverse impact of the charged conspiracy or show that the charged conspiracy had any anticompetitive effect," is OVERRULED in light of controlling authority under *Manufacturers' Ass'n* that the per se rule does not violate due process. Because the government's proposed modifications to the ABA model instruction are better tailored to the evidence to be presented in this case, the court ADOPTS the government's proposed instruction No. 24, rather than defendants' proposed No. 23.

### 7.    Multiple Counts

The government proposes giving an unmodified version of Ninth Circuit Model Instruction No. 3.13, which instructs on Separate Consideration of Multiple Counts for Multiple Defendants. Defendants also propose this model instruction as Defs' No. 6, but propose two additional instructions on consideration of multiple counts:

(a)    Defs' No. 5 is based on Model Instruction 3.11 for Separate Consideration of Multiple Counts - Single Defendant, which is not applicable here. The commentary expressly states: "Use this instruction when there is one defendant charged with multiple counts. If the case involves multiple defendants and multiple counts, use Instruction 3.13 (Separate Consideration of Multiple Counts—Multiple Defendants) instead."

(b)    Defs' No. 16 proposes another instruction addressing the separate charges and separate consideration of the Alameda County count and Contra Costa County

count, based on an instruction given in *Katakis.* This instruction is extraneous in light of the model instruction on multiple counts for multiple defendants. Furthermore, this additional instruction proposed by defendants tells the jury only to consider evidence in the case, and that defendants are not on trial for other conduct not charged in the indictment. This instruction is superfluous and could cause confusion or raise unnecessary questions. However, giving a summary of each count in the final instructions, as proposed by defendants, would be helpful to the jury.

Accordingly, defendants' request to adopt their proposed Nos. 5 and 16 is DENIED, and the court ADOPTS Model Instruction 3.13 as proposed by both parties, Gov't No. 36 and Defs' No. 6, with the summary of charges proposed in Defs' No. 16, as follows:

### **NINTH CIRCUIT MODEL CRIM JURY INSTRUCTION 3.13 (modified):**

A separate crime is charged against one or more of the defendants in each count. The charges have been joined for trial. You must decide the case of each defendant on each crime charged against that defendant separately. Your verdict on any count as to any defendant should not control your verdict on any other count or as to any other defendant.

All the instructions apply to each defendant and to each count unless a specific instruction states that it applies only to a specific defendant or count.

There are three defendants in this case: Michael Marr, Javier Sanchez, and Gregory Casorso. The charges brought against the defendants relate to their alleged activity at foreclosure auctions in Alameda County and Contra Costa County.

<u>Alameda County</u>

All three defendants are charged in Count One with a conspiracy in violation of the Sherman Antitrust Act, Section 1 of Title 15 of the United States Code, at the foreclosure auctions in Alameda County.

<u>Contra Costa County</u>

Defendants Mike Marr and Javier Sanchez alone are charged in Count Six with a conspiracy in violation of the Sherman Antitrust Act, Section 1 of Title 15 of the United States Code, at the foreclosure auctions in Contra Costa County.

### 8.    Opinion Evidence, Expert Witness

Defendants propose giving Ninth Circuit model instruction 4.14 on expert opinion testimony.  Defs' No. 13.  In light of the court's earlier rulings applying the per se rule to this bid rigging case, and denying defendants' motion in limine to admit evidence of Jeffrey Andrien's analysis, defendants' request to include Defs' No. 13 is DENIED.

### 9.    Liability of Superiors

The government proposes instruction No. 23 on liability of superiors, which derives from the ABA model instruction "Corporate Officer - Individual Liability."  As the court has previously held, the government provides no authority extending the standard for vicarious criminal liability outside a corporate context where an officer may try to avoid individual criminal liability distinct from the corporation's liability.  *U.S. v. Guillory*, CR 14-607 PJH, doc. no. 290.  As defense counsel pointed out during oral argument, no corporate defendant has been indicted in this case.  The ABA commentary reflects that the model instruction "confirms the common sense rule that the fact that actions are taken with intent to further corporate business does not relieve the agent of criminal responsibility, and conversely that criminal liability attaches not because of a corporate officer's position, but because the officer acts or fails to act in conformity with the duty imposed by statute."  ABA, MODEL JURY INSTRUCTIONS IN CRIMINAL ANTITRUST CASES at 101-102.  Those concerns about responsibility in the corporate environment, and distinguishing between corporate and corporate officer responsibility, are not present here.  Accordingly, the court adopts the reasons set forth in *Guillory* for rejecting the same proposed instruction on liability of superiors and DENIES the government's request to adopt its proposed instruction No. 21.

48

### 10.    Victor Marr's Proposed Conspiracy Instruction

Victor Marr requests a modified version of the Ninth Circuit model instruction 8.20 on conspiracy, taking an excerpt from the model instruction, omitting standard language, and keeping language, out of context, that "one who has no knowledge of a conspiracy, but happens to act in a way which furthers some object or purpose of the conspiracy, does not thereby become a conspirator."  Doc. no. 214.  He offers no authority for this modified version of the instruction, and the court has previously ruled that a separate conspiracy instruction is redundant because the Bid Rigging instruction proposed by the government's No. 20, which is based on both the ABA model instruction and Ninth Circuit Model Instruction No. 8.20, adequately instructs on the charged bid rigging conspiracy. The government's instruction No. 20 includes both paragraphs of the Ninth Circuit model instruction 8.20 that Victor Marr cites in his requested instruction, without his proposed deletions.

Having determined that a separate conspiracy instruction (a) is not necessary where a separate conspiracy count is not charged and (b) is rendered duplicative by the bid rigging instruction proposed by the government, which is subject to further meet and confer, the court DENIES Victor Marr's request to adopt his proposed instruction on conspiracy.

### C.    Other Instructions

Although none of the parties proposed Ninth Cir. Model Crim. Instr. 2.4 on stipulations of fact, the parties shall notify the court if they enter any such stipulations and the court will determine whether this instruction is appropriate after the close of evidence.

By the first day of trial, the parties must meet and confer as ordered herein and propose (1) a bid rigging instruction based on ABA, MODEL JURY INSTRUCTIONS IN CRIMINAL ANTITRUST CASES at 61-63, after meeting and conferring on Gov't No. 20 and on whether to include instructions on single entity and exchanging information; and (2) an instruction addressing defendants' participation in rounds.

By the first day of trial, the government shall file a blind set of the instructions approved by this order and email a Word version to the court's proposed order mailbox.

## V.     Verdict Form

The government proposes a verdict form separating the findings as to each defendant as to each bid rigging count, and defendants did not propose an alternative form.  Doc. no. 221.  The court adopts the government's proposed form, modified to remove Victor Marr who has been severed for trial, and to separate the counts on different pages.  The verdict form is attached to this pretrial order as Appendix 1.

## VI.    Proposed Voir Dire

The parties jointly propose using the same questionnaire used in *Guillory*, tailored to this case, which the court adopts.  Doc. nos. 211, 219.  Defendants propose additional questions to be included in the questionnaire, but they are either too attenuated to the issues at trial (such as disputes with landlord) and/or unduly personal or sensitive (such as falling behind on mortgage payments).  The juror questionnaire is attached as Appendix 2 to this pretrial order.

As the court instructed at the pretrial conference, the court will conduct the initial voir dire.  The defense will jointly have 30 minutes for additional voir dire, and the government will have 20 minutes for voir dire.

**IT IS SO ORDERED.**

Dated:  April 28, 2017

_____
PHYLLIS J. HAMILTON
United States District Judge